RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0429p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ERIK EARHART,

> *Petitioner-Appellant,*

> No. 07-4127

*v.*

KHELLEH KONTEH,

> *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 06-00062—Herman J. Weber, District Judge.

Argued:  June 16, 2009

Decided and Filed:  December 18, 2009

Before:  MOORE, GIBBONS, and FRIEDMAN, Circuit Judges.[*]

———————————

## COUNSEL

**ARGUED:**  Molly S. Crabtree, PORTER WRIGHT MORRIS & ARTHUR LLP, Columbus, Ohio, for Appellant.  Gene D. Park, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Molly S. Crabtree, James B. Hadden, PORTER WRIGHT MORRIS & ARTHUR LLP, Columbus, Ohio, for Appellant.  Gene D. Park, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

GIBBONS, J., delivered the opinion of the court, in which FRIEDMAN, J., joined.  MOORE, J. (pp. 19-20), delivered a separate opinion dissenting in part.

———————————

[*] The Honorable Daniel M. Friedman, Senior Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

1

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.  Petitioner Erik Earhart appeals the order of the district court denying his petition for a writ of *habeas corpus*.  Earhart alleges that the district court erred in failing to grant the writ because the State of Ohio violated his Sixth and Fourteenth Amendment rights by 1) forcing him to wear a stun belt during the entirety of his trial and 2) admitting into evidence the testimony of alleged victim F.T.[1] by video deposition without a proper finding that the witness was unavailable.  Finding that Earhart's second issue has merit, we hold that the admission of the videotape deposition without a proper finding that the witness was constitutionally unavailable violated Earhart's clearly established right to confrontation under the Sixth Amendment.  Consequently, we reverse the judgment of the district court and grant Earhart a conditional writ as to count four of the indictment, charging him with gross sexual imposition against F.T.  Because Earhart is not entitled to relief upon the remainder of his claims, we affirm the judgment of the district court as to the remainder of the petition.

**I.**

In May 2001, an Ohio grand jury charged Earhart in an indictment with one count of rape of a child under thirteen years of age, in violation of Ohio Revised Code § 2907.02(A)(1)(b), and four counts of gross sexual imposition on a child under thirteen years of age, in violation of Ohio Revised Code § 2907.05(A)(4).  The indictment concerned conduct that occurred at a birthday party at the Preston Hotel in Sharonville, Ohio, that the Ohio Court of Appeals succinctly summarized as follows:

> In May 2001, Earhart, a bus driver and chaperone for a group of
> Michigan children participating in a band competition, visited the Preston
> Hotel in Sharonville, Ohio. A young girl not affiliated with the band was

---

[1]This opinion will refer to the minor victims by their initials in accordance with Federal Rule of Criminal Procedure 49.1(a).

celebrating her tenth birthday with friends at the hotel pool. Earhart approached the girls, spoke with them, and asked one of the girls to accompany him to his hotel room while he changed into his swimsuit. She declined. When Earhart returned to the pool, he joined the girls' games. He picked the children up and threw them into the air. Each of the four female victims described that while Earhart was picking them up, he forcefully rubbed their pubic regions.

Earhart followed the children into a nearby hot tub. There he digitally raped one of the ten-year-old victims. One of the other victims saw the rape. With the rape victim in tears, the girls left the hot tub. The victim told her mother about the attack. The mother summoned Sharonville police and Earhart was arrested. The rape victim was examined at Children's Hospital. Doctors found vaginal abrasions consistent with sexual abuse.

*State v. Earhart*, 2004-Ohio-4791, at ¶¶ 2-3 (Ohio Ct. App. Sept. 10, 2004).

Earhart proceeded to trial in the Hamilton County Court of Common Pleas in July 2002, acting as his own attorney. Prior to the start of the trial, Earhart objected to the State's requiring him to wear a Remote Electronically Activated Control Technology (REACT) belt (the "stun belt"), arguing that it infringed upon his Sixth Amendment right to represent himself. Specifically, Earhart argued that because he had no idea what type of outbursts or actions might cause the deputy to activate the belt, Earhart would necessarily have to curtail the content of questions he might ask as he sought to present his defense. The state trial court agreed to hold a hearing in which the officer in charge of training courtroom deputies as to the proper use of the belt, Lieutenant John Adkins, could testify as to the department's procedures regarding the belt's activation.

Adkins testified that the REACT belt is capable of subjecting its wearer to a 50,000-volt shock of electricity for a period of eight seconds when activated. Despite the fact that Hamilton County authorities had used the belt several hundred times, the deputies had never once activated the belt, intentionally or otherwise.[2] The deputies' training instructed them to activate the belt should a defendant have "any hostile

---

[2] We have previously considered an Ohio prisoner's capital *habeas* petition where officers did accidentally activate a stun belt. *See Filiaggi v. Bagley*, 445 F.3d 851, 853 (6th Cir. 2006). Filiaggi's case, however, did not originate in Hamilton County. *See State v. Filiaggi*, No. 95CA006240, 1997 Ohio App. LEXIS 5468, at *1 (Ohio Ct. App. Dec. 10, 1997) (noting that the trial occurred in Lorain County).

outbursts, any type of combativeness towards anyone in the courtroom, any means of escape." (Trial Tr. at 55.) These training sessions lasted for a minimum of fourteen hours of classroom time. When asked for a more detailed definition of what could constitute a hostile outburst, Adkins refused, explaining "[s]o if you wanted a specific definition for an outburst, I don't have the answer for you." (Trial Tr. at 58.) Ultimately, the decision to activate the stun belt was "up to the officer's discretion" guided by the officer's "common sense." (Trial Tr. at 58.) The officers did receive training that allowed them to avoid mistaking a fervent objection to trial testimony with a hostile outburst. Earhart also questioned Adkins about how the Hamilton County Sheriff's Department determines which prisoners must wear the stun belt during their trials. Adkins explained that "[e]very pro se defendant or control subject that we've had, we utilize the belt." (Trial Tr. at 59.) This policy applied to every *pro se* defendant charged with a felony without regard to the specific characteristics of the defendant.

Following this testimony, the state trial court held that it would defer to the policy of the Hamilton County Sheriff's Department and require Earhart to wear the stun belt at all court proceedings. The trial court made no findings that Earhart was a particularly dangerous defendant, had a propensity to attempt to escape, or was generally unable to conduct himself in a proper manner. The trial court also restricted Earhart's movements within the courtroom to the area in front of the two counsels' tables and the podium. This order forbade Earhart from approaching the witnesses during his questioning. The trial court imposed the same movement restrictions on the prosecution to avoid the jury's drawing an improper inference.

The trial proceeded before a jury and each alleged victim personally testified about Earhart's actions on the evening of the birthday party with the exception of F.T. The State sought to introduce a videotape deposition of F.T. in place of her live testimony, explaining that F.T. had a long-planned vacation that the State did not wish to interrupt. Earhart was present at the deposition, was able to fully cross-examine F.T., and understood that the deposition could be used at trial. However, Earhart objected to the admission of the deposition, arguing that the State had failed to show that F.T. was

constitutionally unavailable. The trial court overruled Earhart's objection and found that the State had complied with the Ohio Rules of Criminal Procedure, which allow for the admission of videotape depositions if a witness is out-of-state. *See* Ohio Crim. R. 15(F).

At the conclusion of all the testimony, the jury convicted Earhart of all five counts of the indictment. The state trial court sentenced Earhart to ten years' imprisonment on the rape count and five years' imprisonment on each count of gross sexual imposition. The trial court further ordered that each sentence was to run consecutively, resulting in a total sentence of thirty years. The sentence represented the maximum possible under the pertinent statutes. *See* Ohio Rev. Code Ann. § 2924.14(C) (establishing the requirements to impose "the longest term authorized for the offense[s]"). Earhart appealed his conviction and sentence to the Ohio Court of Appeals, which affirmed both and rejected his assignments of error as to the trial court's rulings concerning the stun belt and the admission of F.T.'s deposition. *Earhart*, 2004-Ohio-4791, at ¶¶ 4-5, 11-12, 15-18. The Ohio Supreme Court denied Earhart leave to appeal. *State v. Earhart*, 821 N.E.2d 578 (Ohio 2005).

On January 19, 2006, Earhart petitioned for a writ of *habeas corpus* from the United States District Court for the Northern District of Ohio. The petition was transferred to the Southern District of Ohio on February 3, 2006. Earhart raised three claims: 1) the trial court's ruling requiring him to wear a stun belt violated his Fifth, Sixth, and Fourteenth Amendment rights; 2) his sentence violated the Sixth Amendment because it found its basis in facts not found by the jury; and 3) the admission of F.T.'s deposition violated the Confrontation Clause. *Earhart v. Konteh*, No. C-1-06-62, 2007 U.S. Dist. LEXIS 63816, at *7-8 (S.D. Ohio Aug. 29, 2007). The district court held that Earhart had procedurally defaulted his second claim regarding his sentence. *Id.* at *21. As to the two remaining claims, the district court held that the Ohio courts' holdings were objectively unreasonable under clearly established Supreme Court precedents. Analogizing a stun belt to shackles, the district court found that the Ohio state courts erred by requiring Earhart to wear a restraint absent any individualized finding of dangerousness or risk of escape. *Id.* at *25-29. The district court also found that the

admission of F.T.'s videotape deposition was error because F.T. was not unavailable within the meaning of the Sixth Amendment. *Id.* at *40-42. However, the district court held that both errors were harmless because of the significant evidence of Earhart's guilt and thus dismissed Earhart's petition. *Id.* at *33-35, *43-44. The district court further declined to issue a certificate of appealability. *Id.* at *45-46. Earhart timely sought a certificate of appealability from this court; and on April 28, 2008, we granted the certificate limited to the first and third issues raised in his initial petition. *See* 28 U.S.C. § 2253(c)(2).

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs Earhart's petition. Pursuant to its terms, a federal court may only issue a writ of *habeas corpus* to a prisoner in custody for a state court conviction if the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Further, federal courts must presume as correct the findings of fact made by the state court unless the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1).

We may only determine that the state court's holding was contrary to clearly established Supreme Court precedent if "the state court confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision . . . and nevertheless arrives at a result different from [Supreme Court] precedent." *Brumley v. Wingard*, 269 F.3d 629, 637-38 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000) (alterations in original)). A state court decision is also "contrary to" Supreme Court precedent if the "state court applies a rule that contradicts the governing law set forth" by the High Court. *Williams*, 529 U.S. at 405. We may find that the state court unreasonably applied Supreme Court precedent if the state court "correctly identifies the

governing legal rule but applies it unreasonably to the facts of a particular [petitioner's] case." *Id.* at 407-08. The writ may not issue solely because the state court incorrectly applied the relevant Supreme Court precedent. *Id.* at 411. Instead, we must also find that the state court's misapplication was objectively unreasonable for the writ to issue. *Id.* In determining whether the state court misapplied Supreme Court precedent, a federal court may only look to the state of the case law "as of the time of the relevant state-court decision." *Id.* at 412. We must base our decision solely on the holdings of the Supreme Court, not its *dicta* or the holdings of the courts of appeals. *Id.* For the purposes of *habeas* review, an error will be harmless unless it had a substantial and injurious effect or influence in determining the jury's verdict. *See Fry v. Pliler*, 551 U.S. 112, 116 (2007).

### A.

### 1.

Earhart first argues that the district court erred in its holding that the Ohio trial court committed harmless error when it admitted the videotape deposition of F.T. at Earhart's trial in lieu of live testimony. Earhart points to the fact that absent F.T.'s testimony, the State was left with the contradictory assertions of F.T.'s fellow partygoers. The State argues that Earhart waived the issue because both Earhart and his then-attorney "had a complete understanding that the witness's recorded deposition testimony could be used at trial." (Resp. Br. at 43.)

The State relies upon our holding in *Bailey v. Mitchell*, 271 F.3d 652 (6th Cir. 2001), to argue that Earhart waived his right to contest the admission of the videotape deposition. In *Bailey*, we held that a criminal defendant waived his right to confrontation by entering into a *quid pro quo* agreement with a state prosecutor. *Id.* at 657. The petitioner in *Bailey* had agreed to allow the State to admit the videotape deposition if the prosecutor would consent to the defendant's motion for a continuance. *Id.* Importantly, the Ohio state courts found as a factual matter that Bailey had made an explicit deal with the prosecutor for the admission of the videotape. *Id.*

At the hearing to determine the admissibility of the deposition, Earhart did state that he understood that the deposition's purpose was to take the testimony of F.T. for *possible use* at trial. However, the state trial court did not find that Earhart or his prior attorney, Robert Ranz, consented to the admission of the videotape. The trial court merely ruled that the State had satisfied the requirements of the Ohio Rules of Criminal Procedure concerning the admission of videotape testimony when a witness is out-of-state. In the brief section of its opinion addressing Earhart's Confrontation Clause argument, the Ohio Court of Appeals nowhere found that Earhart or Ranz agreed to allow for the deposition's admission. *See Earhart*, 2004-Ohio-4791, at ¶¶ 11-12. The state appellate court instead considered Earhart's objections on the merits and rejected them. *Id.* Contrary to the State's contention, the record clearly reflects that Earhart and Ranz agreed to participate in the deposition of F.T. but that the State would determine later if it would introduce the videotape at all. *See* Trial Tr. at 522 (emphasizing that Earhart understood that the tape "might be" used at trial). When the State affirmatively announced its intention to admit the videotape deposition in lieu of F.T.'s live testimony, Earhart immediately objected to its admission on the ground that F.T. was not truly unavailable. The record fails to demonstrate that Earhart waived his right to contest the admission of the videotape, and we thus will turn to the merits of the issue.

**2.**

We previously have held that the Ohio Rules of Criminal Procedure concerning the admission of videotape testimony do not meet constitutional scrutiny because they do not require a finding of unavailability in the constitutional sense. *Brumley*, 269 F.3d at 640 (finding Ohio Crim. R. 15(F) inconsistent with the Sixth Amendment's Confrontation Clause). The Constitution requires unavailability before a court may admit the prior testimony of a witness. *Ohio v. Roberts*, 448 U.S. 56, 65 (1980), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). Consequently, "the *knowing preparation* of a videotaped deposition as a substitute for the trial testimony *of a constitutionally available witness* is inconsistent with the values of the Confrontation Clause." *Brumley*, 269 F.3d at 642.

F.T. was not present at trial because she was on vacation. The State did not seek to compel her presence by compulsory process even though it knew exactly where F.T. was. Because of its complete lack of effort to secure her presence, Ohio cannot argue that it made the required "good-faith effort to obtain" F.T.'s presence. *Barber v. Page*, 390 U.S. 719, 725 (1968). Thus, despite the fact that Earhart had an opportunity to cross examine F.T., the videotape was not admissible because F.T. was not unavailable. *See Crawford*, 541 U.S. at 59 ("Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable.") We thus affirm the district court's finding that Ohio's admission of the videotape deposition was constitutional error.

The State responds that any error was harmless because F.T.'s testimony was "merely cumulative of other testimony produced by live witnesses at trial." (Resp. Br. at 46.) When considering whether a Confrontation Clause error is harmless, we consider several factors such as "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (citation omitted); *Fulcher v. Motley*, 444 F.3d 791, 809 (6th Cir. 2006).

F.T. was the alleged victim of the gross sexual imposition charge specified in count four of the indictment. Her testimony, as the actual victim, would have undoubtedly been the most convincing evidence as to that charge. Excluding F.T.'s testimony, the State was left with the following conflicting accounts of six witnesses: K.H. testified that she saw Earhart throw F.T. into the pool. M.M. testified that Earhart held five girls, including F.T., "in a bad area" when he threw them into the pool. (Trial Tr. at 467-68.) Finally, J.M., the rape victim, testified that Earhart had thrown F.T. and two others the same way he had thrown her; namely, with his hands in between her legs.

This testimony was offset by that of three other witnesses. Jeri Leach, the mother of J.M. and the only adult supervising the pool party, did not recall F.T. as one of the

children Earhart tossed into the pool.  Similarly, J.R. did not remember seeing Earhart throw F.T. into the pool.  D.M. stated that she only saw Earhart throw J.M.  D.M. further testified that F.T. was not in the pool at the time Earhart threw J.M.  Leach corroborated this part of D.M.'s testimony with her recollection that F.T. "got out for a little while to go back to the room for some reason."  (Trial Tr. at 373.)

In summary, absent F.T.'s testimony, the State presented three witnesses who clearly remembered Earhart's throwing F.T.  Two of those witnesses specifically recalled Earhart as having grabbed F.T. between her legs.  Three other witnesses could not recall Earhart's throwing F.T.  Two of those witnesses did not recall that F.T. was in the pool during the time that Earhart threw the other children.  A jury certainly could have believed the specific testimony of J.M. and M.M. that Earhart sexually assaulted F.T.  However, a jury also could have credited the testimony of D.M., corroborated by the only other adult at the pool other than Earhart, that F.T. was not in the pool area when Earhart threw the other children.  Given this factual dispute, it is likely that F.T.'s videotape deposition helped to cure the doubts sown by Leach's, J.R.'s, and D.M.'s testimony.  The prosecution clearly had a much weaker case for the gross sexual imposition charge regarding F.T. without the victim's testimony.  Because we find that F.T.'s testimony that Earhart sexually assaulted her was key to the jury's decision to convict Earhart of count four, admission of the videotape deposition was not harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (stating that a Confrontation Clause error is not harmless if it had "a substantial and injurious effect or influence in determining the jury's verdict").  We therefore reverse the district court and grant a conditional writ as to count four of the indictment.

**3.**

During oral argument, Earhart asserted that the admission of F.T.'s deposition tainted his remaining convictions because F.T. was the only witness who provided testimony that allowed the jury to infer that Earhart's touching of the girls was sexually motivated.  Specifically, Earhart noted that F.T. testified that Earhart invited F.T. to come up to his room while he changed into his swimsuit.  Despite the absence of a

transcript of the deposition in the record on appeal, it is clear that F.T. did so testify because the prosecutor made reference to this portion of F.T.'s testimony in his closing argument:  "But you can draw an inference [that the touching was of a sexual nature] from the fact that this stranger, this man said to [F.T.], come to my room while I change into my bathing suit."[3]  (Trial Tr. at 710-11.)  Earhart is therefore correct that F.T.'s testimony would allow the jury to draw the inference that Earhart's touching of the girls was sexually motivated.

Earhart is incorrect, however, that F.T.'s testimony provided the only evidence from which the jury could draw such an inference.  Leach, J.M.'s mother, testified that Earhart had told "[t]he girls" his room number.  (Trial Tr. at 368.)  J.M.'s brother testified that, when throwing the girls in the pool, Earhart grabbed them differently than when Earhart threw him.  Earhart grabbed the brother by the waist; however, Earhart held the girls by the bottom.  Each alleged victim also testified that Earhart grabbed her in between her legs.  J.R. testified that when Earhart touched her between her legs, it was not a glancing brush but rather "was on purpose."  (Trial Tr. at 427.)  Both K.H. and J.M. described how Earhart rubbed them between their legs when he grabbed them.  M.M., who attended the party but did not claim Earhart assaulted her, testified that Earhart "supported [J.R., K.H., and J.M.] in a bad area" when he threw them.  (Trial Tr. at 467-68.)  Likewise, fellow party attendee D.M. testified that Earhart grabbed J.M. "[u]nder her private and her butt" when he threw J.M.  (Trial Tr. at 483.)  The prosecutor seized on this consistent testimony by all four alleged victims to prove Earhart's sexual intent:  "What stranger, what adult man going to . . . different girls in a swimming pool and consistently and repeatedly picks those girls up with one hand between their legs?"  (Trial Tr. at 716-17.)

Earhart's own actions at trial coupled with medical evidence further demonstrate the wealth of evidence stacked against him with regard to the remaining charges.

---

[3]J.M. testified that Earhart told F.T. and K.H. to come up to his room while he changed into his swimsuit and gave each his room number.  Upon Earhart's contemporaneous objection, the trial court struck J.M.'s statement from the record as inadmissable hearsay.  (Trial Tr. at 502-03.)  We therefore do not consider this testimony when determining whether the erroneous admission of F.T's videotape deposition tainted Earhart's remaining convictions.

Earhart admitted that he tossed J.M., K.H., and J.R into the pool. He further admitted that "[e]ach time [J.M.] was picked up and tossed in the same manner." (Trial Tr. at 706.) This corroborated the consistent testimony of the victims that Earhart tossed each of them from the same position – one that began with his hand between their legs. A medical exam and the testimony of K.H. corroborated J.M.'s own testimony regarding the rape count. Based upon the testimony at trial, the jury had ample evidence from which it could conclude that Earhart's actions found their basis in a search for sexual gratification even absent the undeniably damaging testimony of F.T. Unlike count four charging gross sexual imposition with regard to F.T., the evidence against Earhart as to the remaining counts of the indictment was hardly "based tenuously on circumstantial evidence" or contradictory testimony. *Cf. United States v. Miller*, 319 F. App'x 351, 355 (6th Cir. 2009). The erroneous admission of F.T.'s videotape deposition cannot have tainted the remaining convictions, and we accordingly decline to issue the writ on this basis *See Fry*, 551 U.S. at 116 (requiring a finding of "substantial and injurious effect or influence in determining the jury's verdict" as a prerequisite to granting *habeas* relief) (internal quotation marks and citation omitted).

**B.**

Earhart next argues that the district court erred by failing to grant the writ because the state trial court's ruling requiring him to wear a stun belt at trial without any individualized finding of necessity violated both his Sixth Amendment right to act as his own attorney and the due process clause of the Fourteenth Amendment. Earhart alleges that the stun belt was visible to the jury, prejudicing his ability to receive a fair hearing. Earhart further asserts that the restrictions on his movement placed by the trial court further cast the pall of guilt over him in the jurors' eyes. Finally, the petitioner argues that the mere presence of a stun belt capable of delivering a 50,000-volt shock to his kidneys necessarily chilled his ability to ask certain lines of questions in what was already certain to be an emotionally charged case. The State responds that the district court erred in its holding that the state trial court committed constitutional error in ordering Earhart to wear the belt because the Supreme Court has never ruled on the

constitutional protections a defendant is entitled to before he may be so restrained.  In the alternative, the State argues that the evidence against Earhart was so overwhelming that no prejudice to his case could have resulted from his wearing the stun belt.  We turn first to the question of whether Earhart may claim the protection of a clearly established constitutional right.  *See* 28 U.S.C. § 2254(d)(1) (prohibiting the granting of *habeas* relief absent a clearly established right under federal law "as determined by the Supreme Court of the United States").

## 1.

The State is correct that the Supreme Court has yet to consider the issue of whether and when a trial court, consistent with constitutional protections, may order a defendant to wear a stun belt during his trial.  However, the Supreme Court has decided a series of cases over the past forty years that clearly establish the proposition that a trial court may not impose a physical restraint upon a defendant's person without an individualized finding of dangerousness or risk of escape.  *See, e.g.*, *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986) (noting that shackling is "inherently prejudicial" and is only "justified by an essential state interest specific to each trial"); *Illinois v. Allen*, 397 U.S. 337, 343-44 (1970) (holding that "no person should be tried while shackled and gagged except as a last resort" but that such measures are allowed if the defendant is "disruptive, contumacious, [and] stubbornly defiant").  The Supreme Court most recently reaffirmed these principles in *Deck v. Missouri*, 544 U.S. 622, 626 (2005), by noting that "[t]he law has *long forbidden* . . . permit[ting] a State to shackle a criminal defendant [without] the presence of a special need."  (emphasis added).  While the Supreme Court decided *Deck* after Earhart's conviction became final, the principle that the State cannot as a matter of general policy shackle a defendant predates *Deck*.  *See id.*; *Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005) ("[T]he principle that shackling a defendant at trial without an individualized determination as to its necessity violates the due process clause was clearly established long before *Deck* was decided.").  This is because physical restraints necessarily degrade a defendant's ability to aid in his own defense.  *Allen*, 397 U.S. at 344.

As our court recently has noted, however, *Deck* also clarified the contours of the clearly established constitutional protection against unnecessary physical restraints during trial. In *Mendoza v. Berghuis*, 544 F.3d 650, 651 (6th Cir. 2008), the petitioner sought *habeas* relief because, at his Michigan trial for assault with intent to commit murder, Mendoza wore leg shackles that were not visible to the jury. As with the Ohio Court of Common Pleas here, the Michigan trial court made no specific factual findings concerning Mendoza's likelihood of escape or dangerousness when it issued its order requiring Mendoza to be shackled. Instead, the trial court deferred to the recommendation of the local sheriff's department. *Id.* To prevent the jury from seeing the shackles, the Michigan trial court "skirt[ed] both counsel tables with brown paper for the duration of the trial." *Id.* Mendoza argued that the jurors most likely suspected that he wore shackles during his trial, particularly because some jurors inadvertently had seen Mendoza shackled as officers led him into the courthouse. *Id.* at 652.

On appeal, we affirmed the district court's denial of the writ. *Id.* at 651. We first noted that even though the Supreme Court decided *Deck* – the case Mendoza primarily relied upon – after Mendoza's conviction, our precedents required us to apply *Deck*'s holding "*in toto*" as though it were clearly established at the time of Mendoza's conviction. *Mendoza*, 544 F.3d at 654 (citing *Lakin*, 431 F.3d at 963). The question thus became what exactly did *Deck* reemphasize as a clearly established constitutional right. Because the Supreme Court had stressed "at least six times" the limitation of its holding to visible restraints, we held that *Deck* "concerned only *visible* restraints at trial." *Id.* The Michigan courts' resolution of Mendoza's appeal thus was not objectively unreasonable, as the brown paper surrounding both counsels' tables prevented the jurors from ever knowing that Mendoza wore shackles at his trial.[4] *Id.* at 655. The fact that the trial court had allowed Mendoza to testify in his own defense free from any physical restraints also served to prevent the jury from drawing an adverse

---

[4] The fact that several jurors saw Mendoza in shackles as officers transported him to the courtroom was irrelevant because "[r]estraining a defendant in the courtroom, and restraining him during transport there, are two very different things." *Id.* at 655 (citing *United States v. Moreno*, 933 F.2d 362, 368 (6th Cir. 1991)). Reasonable jurors expect deputies to restrain all defendants in transport so that the sight of a shackled Mendoza in this context could cause no prejudice. *Id.*

inference from the presence of the brown paper.  *Id.* at 652.  Nor did we find it a violation of clearly established Supreme Court precedent because "the Michigan courts did not hold that *visible* shackling, absent the determination of necessity required by *Deck*, was permissible."  *Id.* at 654 (emphasis added).

Under this narrow interpretation of *Deck*, Earhart's appeal rises or falls on the question of whether the stun belt was visible to the jury.  If Earhart's stun belt was a visible restraint, due process mandates an individualized finding of necessity before the state courts could require Earhart to wear the belt.  *See Mendoza*, 544 F.3d at 654; *see also Deck*, 544 U.S. at 624 (holding that an essential interest "specific to the defendant" is required to physically restrain a defendant during his trial); *Holbrook* 475 U.S. at 468-69.  If the stun belt was not visible, then there is not a violation of clearly established federal law sufficient to grant the writ.[5]  *Mendoza*, 544 F.3d at 654.

Earhart claims that the stun belt was visible to the jury.  The state appellate court flatly rejected this argument and found as a factual matter that the belt was not visible.  *See Earhart*, 2004-Ohio-4791, at ¶ 5 (stating that "there is no evidence that the jury was aware of the stun belt").  This finding of fact by the state court is binding upon us unless Earhart can show it is clearly erroneous.  28 U.S.C. § 2254(e)(1).  Earhart cannot meet this high burden because the transcript of the proceedings makes clear that even the state trial judge was unaware Earhart was wearing the belt until Earhart specifically brought it to his attention.  As the trial judge considered the propriety of requiring Earhart to wear the belt during his trial, the judge interrupted himself to ask, "And I will – you are not wearing the belt right now are you?"  (Trial Tr. at 11.)  If an experienced trial judge could not tell that Earhart was wearing a stun belt underneath his clothes, the members

---

[5]This court held in *United States v. Miller*, on plain-error review of a post-*Deck* district-court decision, that due process post-*Deck* requires an individual hearing on the use of a stun belt during trial, even if non-visible.  531 F.3d 340, 344-45 (6th Cir.), *cert. denied*, 129 S. Ct. 307 (2008).  Earhart's trial, however, occurred prior to *Deck*.

of the jury are highly unlikely to have detected it either.  Earhart thus has failed to establish a due process violation based upon the visibility of the belt itself.[6]

**2.**

Sensing the strength of the state courts' factual findings, Earhart asserts that while the stun belt may not have been clearly visible to the jury, its effects clearly were. In what is more properly characterized as an argument that the Ohio courts violated his Sixth Amendment right to act as his own attorney, Earhart alleges that the restrictions placed upon his movements combined with his own self-imposed limitations on his lines of questioning necessarily led the jury to draw the conclusion that Earhart was especially dangerous – thereby severely prejudicing his defense.  Ohio responds by once again emphasizing the state courts' factual findings that both the prosecutor and Earhart were subject to the same movement restrictions.  The State also notes the strength of the evidence marshaled against Earhart so that even were there a constitutional violation, no prejudice could have resulted.

To support his argument that the state trial court allowed the prosecutor to move about the courtroom freely while tightly constraining Earhart's movements, Earhart directs us to the following statement made by the prosecutor:

> But in the issue of dealing with children, I do have to move closer . . . to make the children comfortable  and to make them heard, if that's necessary, I want leeway to approach them. . . . I don't have a problem with any other witnesses . . . . I may take a chair and put a chair where

---

[6]Our holding that Earhart is not entitled to relief under the limited purview of *habeas* review should not bring comfort to Ohio authorities.  As a matter of state law, Ohio requires that physical restraints – such as a stun belt – may only be used "as a last resort . . . justified by an essential state interest specific to each trial." *State v. Leonard*, 813 N.E.2d 50, 62-63 (Ohio Ct. App. 2004) (internal quotations and citations omitted).  The state trial court failed to make the required individualized findings, *see id.*, and the Ohio Court of Appeals declined to enforce its own precedent when reviewing Earhart's appeal. *See Earhart*, 2004-Ohio-4791, at ¶ 5 (purporting to apply *Leonard*).  Only the fact that a federal court may not grant *habeas* relief because of an error solely of state law saves Ohio from the consequences of Hamilton County's policy of requiring all *pro se* felony defendants to wear a stun belt during their trials. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Indeed, were this issue before us on direct appeal from a trial before a federal district court, we would reverse and remand for a new trial without hesitation. *See, e.g.*, *United States v. Durham*, 287 F.3d 1297, 1300 (11th Cir. 2002) (reversing and remanding for a new trial because "the district court did not make findings on the record sufficient to justify the use of [the] extraordinary security measure" of a stun belt); *United States v. Waagner*, 104 F. App'x 521, 526-27 (6th Cir. 2004) (affirming an order requiring a defendant to wear a stun belt where the district court made individualized findings of necessity).

the witness stand is to make my physical presence less intimidating to a child who is about to testify.  These are just various techniques that I've developed over 20 years of doing this, and I do not want to be limited in that regard.

(Trial Tr. at 65-67.)   Earhart argues that the prosecutor's statement proves the importance of being able to approach the witness stand freely when questioning child witnesses.  Because the trial court required Earhart to remain either behind a podium or within a small rectangular area located in front of both counsels' tables at all times, Earhart asserts that the prosecutor's own words prove that his defense suffered.

The record belies Earhart's argument.  Almost immediately after the prosecutor made the above-quoted argument to the state trial court, the trial judge overruled the prosecutor's objections and required him to abide by the *exact same movement restrictions* as Earhart.  *See* Trial Tr. at 68 ("And I will ask the State to comply with the same restrictions.").  On direct appeal, the Ohio Court of Appeals examined the record and found as a factual matter that the prosecutor *did* abide by the same movement constraints as Earhart.  *See Earhart*, 2004-Ohio-4791, at ¶ 5 ("The trial court identified areas of the courtroom in which Earhart could move freely without fear of being stunned, and it imposed the same movement restrictions on the assistant prosecutor.").  Earhart has presented no evidence to demonstrate that the prosecutor failed to follow the state trial court's order.  *Cf.* 28 U.S.C. § 2254(e)(1).  Indeed, the only time the prosecutor appears to have left the confines demarcated by the trial court was when Earhart himself requested that the prosecutor deliver a mannequin to a witness to aid that witness in answering Earhart's questions on cross-examination.  *See* Trial Tr. at  413 (the prosecutor asks that "the record [] reflect Mr. Earhart has asked [the prosecutor] to assist him with the manikin [*sic*]").  Because there was no disparity between the restrictions placed upon Earhart and those placed upon the prosecution, no violation of Earhart's Sixth Amendment right to act as his own attorney occurred.

In light of the overwhelming evidence of Earhart's guilt on the remaining four counts of the indictment, Earhart similarly cannot succeed as to his claim  that the trial court's order requiring him to wear the stun belt had a "chilling effect" upon him.  As

noted above, the prosecutor presented the jury with the consistent, corroborated testimony of each of the victims. Each defendant, except F.T., personally testified and identified Earhart in open court as her assailant. Each victim described the same act of fondling – the placing of Earhart's hands between her legs and rubbing of the pubic area. This is undoubtedly powerful evidence of Earhart's guilt. As to the rape count, not only did the victim J.M. testify that Earhart penetrated her with his finger but also an independent medical examination supported this accusation. K.H. additionally testified that she was underwater wearing goggles at the time of digital rape and saw Earhart place his finger underneath J.M.'s bathing suit. Finally, there was the damning interrogation videotape of Earhart chewing off his fingernails after learning that the police intended to swab underneath them for any DNA evidence. It is unsurprising that Earhart can present us with no additional lines of questioning he might have undertaken to clear his name. In light of this mountain of evidence, there was little he could do that he did not already attempt in his effort to escape conviction. We therefore agree with the district court that Earhart is not entitled to *habeas* relief as to any of the remaining four charges on which the jury convicted him.

## III.

For the foregoing reasons, we reverse the judgment of the district court and grant Earhart a conditional writ of *habeas corpus* as to count four of the indictment, charging gross sexual imposition against alleged victim F.T. The State of Ohio shall have 120 days from the issuance of this court's mandate either to commence a retrial of Earhart on count four or vacate his sentence as to the count, leaving Earhart with an effective sentence of twenty-five years. As to all other issues, we affirm the judgment of the district court dismissing Earhart's *habeas* petition.

---

**DISSENTING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, dissenting in part.  I dissent from Part II.B.2 of the majority opinion because I believe that we should remand to the district court for an evidentiary hearing on Earhart's first issue:  whether his Sixth Amendment right to present a complete defense was violated by the trial court's failure to enforce the movement restrictions against the prosecutor.

I disagree with the majority that the record "belies Earhart's argument" that "the state trial court allowed the prosecutor to move about the courtroom freely while tightly constraining Earhart's movements."  Maj. Op. at 17.  While the transcript does not record directly the movements of the parties as the jury would have viewed them, it appears that Earhart abided by the district court's restrictions, and, thus, the stun belt's *effects* on Earhart were visible even if the actual belt itself was not.  There is no indication in the record that Earhart approached any witnesses—instead, the record indicates that he requested the prosecutor deliver exhibits to witnesses multiple times. *See* Trial Tr. at 413, 432, 450, 457-58, 472, 474, 485-86, 567-68.  The record does indicate, however, that the prosecutor had more freedom of movement during the trial despite the fact that Earhart and the prosecutor were purportedly subjected to the same restrictions.  For example, the prosecutor held the mannequin he used with several witnesses because it would not stay on the witness stand after he set it there, Trial Tr. at 408-10, 426, 445-46, 468, 483-84, 503-04, and he also handed it to two child witnesses whom he asked to "step down here" and "come over here" to sit in a chair and hold the mannequin for demonstrative purposes, Trial Tr. at 462-63, 506-07.  I also believe that it is questionable whether the prosecutor physically approached witnesses when utilizing exhibits, as he stated several times that he was "showing" or "handing" or "giving" exhibits to witnesses.  Trial Tr. at 360-61, 365, 387-89, 404, 423, 441, 466, 481, 496-97, 562-63, 577, 645.  Contrary to the majority's conclusion, then, a review of the record shows there could have been a disparity between the movements of the parties during

the trial that violated Earhart's "Sixth Amendment right to act as his own attorney," rebutting any factual determination to the contrary. *See* 28 U.S.C. § 2254(e)(1).

A violation of the Sixth Amendment right to conduct one's own defense is a structural trial error not subject to the harmless-error rule; thus, whether Earhart was prejudiced is irrelevant in determining whether his movement restrictions violated his right to self-representation. *McKaskle v. Wiggins*, 465 U.S. 168, 173, 174, 177, 177 n.8 (1984) (holding an accused has a constitutional right under the Sixth Amendment "to conduct his own defense," and the "primary focus" in determining whether this right was violated "must be on whether the defendant had a fair chance to present his case in his own way" (citing *Faretta v. California*, 422 U.S. 806 (1975))). If Earhart's rights were violated, the Ohio Court of Appeals acted "contrary to" clearly established federal law in applying a harmless-error analysis, and habeas relief would be appropriate. *Mendoza v. Berghuis*, 544 F.3d 650, 653 (6th Cir. 2008) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

Because the record on appeal is unclear as to whether the prosecutor "did abide" by the restriction—and, if not, how much the prosecutor actually did move about the courtroom while Earhart remained restrained—it is appropriate to remand for an evidentiary hearing on whether Earhart's Sixth Amendment right to participate fully in his pro se defense was violated.

For these reasons, I respectfully dissent from Part II.B.2 of the majority opinion.