NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0792n.06

No. 10-5134

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jul 20, 2012*
LEONARD GREEN, Clerk

GERALD RAYBORN,

     Petitioner - Appellee,

v.

UNITED STATES OF AMERICA,

     Respondent - Appellant.

                                          /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE

BEFORE:    MARTIN, CLAY, and WHITE, Circuit Judges.

**CLAY, Circuit Judge.**  The government appeals the decision of the district court vacating Defendant Gerald Rayborn's convictions and sentence for arson and mail fraud. The district court granted relief pursuant to 28 U.S.C. § 2255 because it found that Rayborn suffered ineffective assistance of counsel related to his testimony at trial.

Not informing Rayborn of the dangers of testifying was an unquestionable miscalculation by the defense. That mistake might have been excusable, however, had the defense team at least sufficiently prepared Rayborn for his testimony and then conducted his testimony properly. Instead, the team failed to provide adequate advice and preparation to their client prior to his second trial. Thereafter, counsel called Rayborn to the stand, asked him only two perfunctory questions on direct examination, and then sacrificed him to a lengthy and hostile cross-examination. The prosecutor capitalized on this prime opportunity by dramatically dismantling Rayborn's credibility before the

jury. Despite the unquestionable damage Rayborn's testimony wrought to the defense, counsel inexplicably and indefensibly made no effort to rehabilitate Rayborn's testimony by redirect examination. This series of events left the jurors with the unmistakable impression that Rayborn was a liar, a cheat, a fraudster, and an arsonist. Through their errors, the defense team did as much to convict their client as did the government.

For these reasons and those that follow, we agree with the district court's judgment and **AFFIRM**.

## BACKGROUND

On the afternoon of August 25, 1998, three women visited the New Mount Sinai Missionary Baptist Church in Memphis, Tennessee to consider the venue for an upcoming wedding. The women were met by the church's pastor, Defendant Rayborn, who greeted them before leaving them alone to tour the sanctuary. About twenty minutes later, the church lights flickered and went out, and the women heard a loud boom. The women looked for Rayborn but could not find him, and when they smelled smoke and spotted a glow emanating from underneath a door, they fled the building and dialed 911. Unbeknownst to them, Rayborn had spoken briefly to a maintenance man working on the outside of the church and then left for his nearby home to take a nap. Shortly after the women contacted emergency services, Rayborn was awoken on his couch by a family member to the news that the church was on fire. Rayborn rushed to the church where he and several other employees attempted to remove valuable items from the church and its garage.

Despite the church's close proximity to a fire station, the blaze spread quickly, and the building was destroyed beyond repair. Although the fire was initially deemed accidental,

investigators were suspicious about the extent of the damage caused in such a short period of time. Investigators went back over the charred remains and discovered evidence indicating that the fire might have been intentionally set. As the individual in charge of the premises that day, Rayborn quickly emerged as the investigation's primary suspect.

The investigators' suspicions only deepened when they examined the church's finances and discovered that the church had an unusual financial arrangement with its pastor. Investigators learned that Rayborn exercised virtually unfettered control over the church's operations and finances, in exchange earning a nominal cash salary supplemented by significant in-kind benefits, including housing and multiple expensive automobiles. Checks written out of the church's business accounts indicated that Rayborn intermingled church funds with his personal funds and that he sometimes used his employer's money to pay for his personal expenses. After the fire, investigators learned that Rayborn exercised his power of attorney for the church and filed an insurance claim on its behalf.[1]

## A. The First Trial

In 1999, a federal grand jury indicted Rayborn on one count of arson and two counts of mail fraud, in violation of 18 U.S.C. §§ 844(i) and 1341, respectively.[2] The arson count carried a sentence

---

[1]A more thorough recitation of the facts was laid out by this Court in a prior opinion. *See United States v. Rayborn*, 495 F.3d 328, 331–35 (6th Cir. 2007) (*"Rayborn II"*).

[2]Before trial, Rayborn argued that the church was not sufficiently engaged in interstate commerce to support a federal arson charge. The district court agreed and dismissed the arson count for want of subject matter jurisdiction. The government appealed, and this Court reinstated the indictment. *See United States v. Rayborn*, 312 F.3d 229, 231 (6th Cir. 2002) ("*Rayborn I*").

of five to twenty years imprisonment, while the mail fraud counts carried a sentence of up to twenty years imprisonment.

On July 14, 2003, Rayborn proceeded to trial, where he was represented by a three-person defense team comprised of attorneys James Garts, Jr.; James Wilson; and A.C. Wharton, Jr. The government's primary evidence of arson relied on pour patterns and alleged accelerants discovered in the debris. In addition, the government introduced the church's finances under Federal Rule of Evidence 404(b) as proof that Rayborn had a motive to set the blaze and to file a fraudulent insurance claim in order to gain access to additional church assets.

To combat the government's case, Rayborn contended that the fire was accidental. In support, he called two expert witnesses, as well as several friends, family members, and church employees. However, his defense rested largely on his own testimony. Attorney James Garts called Rayborn to the stand for an extensive direct examination that lasted almost three hours. Rayborn emphatically avowed that he did not and would not set fire to his church. He also provided a detailed account of his whereabouts and his movements on the day of the fire, including the short periods throughout the day where he was not in the presence of church patrons or other church employees. These periods were particularly important to the defense, since the government suggested that Rayborn used those windows of time to lay the accelerants and to light the fire. Rayborn also provided an alternative explanation for the alleged accelerants, pointing out that common flammable household chemicals used to upkeep the premises, such as paint thinner and gasoline, were stored onsite.

In addition, the defense devoted a considerable amount of Rayborn's direct testimony to rebutting the Rule 404(b) evidence and to combating the government's theory of motive. Rayborn frankly admitted that he occasionally used the church's money for his personal affairs, but he claimed that when he did so he always repaid the church. He explained that the church board was well aware of his uses of its money; that the board approved their financial arrangement; and that, no matter how unusual it might seem to outsiders, no one had ever complained that he misappropriated church funds. Rayborn also explained that although he personally submitted the insurance claim, he did so solely on the church's behalf pursuant to his legal power of attorney. He testified that he understood that the church was the named beneficiary of the insurance policy and that he never expected to personally gain from the insurance proceeds. On cross-examination, the government vigorously and aggressively challenged Rayborn's explanations. Under pressure from the prosecution, Rayborn became visibly upset and emotional on the witness stand.

Despite Rayborn's performance on cross-examination, the defense apparently succeeded in its efforts to raise reasonable doubt. After much deliberation, the jury announced they were deadlocked, and the district court entered an order of mistrial.

**B.      The Second Trial**

The government opted to retry the case. On August 10, 2004, Rayborn proceeded to a second trial, again represented by his three-person defense team.[3] At the second trial, the government put

---

[3]Between the trials, defense counsel Wharton was elected mayor of Memphis. His wife and former law partner, Ruby Wharton, joined the defense team in his stead.

forth a case similar to its presentation at the first trial.   Rayborn, however, did not present the same

defense.

At the second trial, defense counsel again called Rayborn to the witness stand.  This time,

however, a different member of the defense team, James Wilson, conducted Rayborn's direct

examination.   Attorney Wilson's entire direct examination consisted of two substantive

questions—"Did you burn the new Mt. Sinai Church?" and "Did you [] get anybody else to burn it?"

Rayborn emphatically denied doing either, and Wilson rested.

The short direct did not faze the government.  The prosecutor subjected Rayborn to another

vigorous and hostile cross-examination.  The government opened its lengthy cross-examination by

commenting that, since Rayborn had been present in the courtroom for the entire trial, he had the

opportunity to manipulate his testimony in response to the government's case.  Having insinuated

that Rayborn could not be trusted to testify honestly, the prosecutor remarked that he would therefore

limit his questions to those on which he and Rayborn "could agree" to an "accurate" response.  From

that point forward, the prosecutor posed the majority of his questions in a "do you agree, will you

agree" type format.  This tactic limited Rayborn's responses on cross-examination to mostly "yes"

and "no" answers.  Predictably, the questions were fashioned so as to elicit incriminating responses,

while avoiding exculpatory explanations.

Rayborn acknowledged that he was alone for periods of time on the day of the fire and that

he had sufficient time and access to commit arson.  He admitted that the church board granted him

free use of church funds.  The prosecutor expended significant effort and detail reviewing the series

of checks Rayborn wrote from the church accounts to pay for his personal expenses.  On this score,

Rayborn's testimony was circumscribed to identifying the checks, admitting that he wrote and signed them, and stating what personal expenditures they paid, including his personal credit card bills and window tinting for his automobile. Although Rayborn made several attempts to explain that he repaid his employer for his personal purchases, his interjections were brief, inconsistent, and actively interrupted by the prosecutor. Finally, Rayborn conceded that he signed the insurance forms, but he was provided with no leeway to explain why he did so. This cross-examination, essentially a prolonged succession of admissions to the most inculpatory facts in the case, portrayed Rayborn in the worst possible light.

Despite the obvious damage wrought to the defense, Attorney Wilson opted not to conduct a redirect examination. The defense team then declined to put forth any additional evidence to rehabilitate Rayborn's damaged credibility, and they made no attempt to mitigate the adverse impact of his incriminating admissions on his pleas of innocence.

With little need for deliberation, the jury promptly convicted Rayborn on all counts. He was sentenced by amended judgment to five years imprisonment and two years of supervised release.

Represented by new counsel, Rayborn timely filed a direct appeal. This Court denied relief.[4] *Rayborn II*, 495 F.3d at 330. Rayborn surrendered to the custody of the Bureau of Prisons shortly thereafter.

---

[4]In denying Rayborn's direct appeal, this Court held: (1) that the law of the case doctrine barred it from reconsidering whether the church's interstate activity was sufficient to support federal charges; (2) that the evidence was sufficient to support the arson and mail fraud convictions; (3) that the district court properly admitted the evidence regarding Rayborn's use of church funds under Rule 404(b); and (4) that the district court did not err in allowing the testimony of a particular rebuttal witness for the government. *Rayborn II*, 495 F.3d at 330.

## C.      Collateral Review

In June 2009, Rayborn filed a federal habeas petition requesting that his convictions be vacated pursuant to 28 U.S.C. § 2255. His motion raised five grounds for relief, of which only his claim of ineffective assistance of counsel is significant to this appeal.[5]

During a two-day evidentiary hearing convened by the same district court that presided over both trials, Rayborn contended that his defense team was ineffective in managing his testimony at the second trial. In support, habeas counsel called two witnesses at the evidentiary hearing: T. Clifton Harviel, Jr., a lawyer specializing in criminal defense who testified as an expert witness, and Rayborn. The government called Garts, the member of the trial team who conducted Rayborn's testimony at the first trial, but not at the second. We focus on Rayborn and Garts' testimony, inasmuch as their testimony provides the most relevant insight into the relationship between counsel and client in this case.[6]

---

[5]Rayborn petitioned for § 2255 relief on the bases that trial counsel was ineffective for (1) failing to introduce expert testimony to discredit the government's floor/pour pattern theory supporting arson; (2) failing to call expert witnesses to discredit "unscientific" trial testimony that the fire had multiple points of origin; (3) failing to introduce expert testimony on the cause and origin of the fire; (4) calling Rayborn as a witness, given that it exposed him to 404(b) evidence on cross examination; and (5) failing to withdraw from the case due to a conflict of interest.
Rayborn does not cross-appeal the theories for relief rejected by the district court.

[6]Attorney Harviel's testimony is briefly summarized. Harviel testified that, in his expert opinion, the defense team's management of Rayborn's testimony at the second trial constituted ineffective assistance of counsel. Harviel faulted counsel for failing to fully advise Rayborn of the dangers presented by the 404(b) evidence and for not suggesting to their client that it was not in his best interests to expose himself to cross-examination. Harviel noted that counsel's failure to lead Rayborn through the facts of the case, coupled with the form of the prosecutor's questions, prevented Rayborn from providing his own narrative of the events. Harviel also opined that the lengthy cross, when compared to the abbreviated direct and lack of redirect, prejudiced Rayborn's credibility.

At the evidentiary hearing, Rayborn testified that the team generally included him in their strategy sessions and that they notified him that they intended to limit their questions during the second trial. Rayborn stated, however, that the team did not fully explain their reasons for recommending this tactic and that they did not thoroughly inform him of its possible effects. Significantly, Rayborn claimed that his counsel did not caution him that limiting the direct examination would not curtail the scope or length of the prosecutor's cross-examination. Rayborn claimed that, had he known this information, he would not have chosen to testify a second time.

In rebuttal, the government called defense team attorney Garts. Garts conceded that the team's preference was that Rayborn testify, because they believed his testimony was crucial to combating the government's case. Garts stated that the team therefore limited their suggestions to "the ins and outs" of testifying. Nevertheless, Garts implied that the team's advice was of secondary importance, because he believed that "wild horses" could not have prevented Rayborn from taking the witness stand.

Garts also explained that the limited examination was the key tactical component of the defense team's strategy for the second trial. The team felt that the mistrial was not a "successful" outcome for their client, and despite the hung jury their efforts secured, the team remained concerned about Rayborn's poor performance on cross-examination. They surmised that Rayborn's inability to control his emotions with the prosecutor might have been attributable to the length of their own

---

Harviel criticized the failure to conduct a redirect and stated that this omission allowed Rayborn to be "tarred and feathered" in front of a jury that was not given "the whole picture" of his defense.

9

direct examination. They speculated that Rayborn might perform better on cross-examination if he was "fresh" to the stand. Garts explained that he had personally used this same limited examination tactic in the past, to some success.

As the team member assigned to Rayborn's testimony at the first trial, Garts explained that he thoroughly reviewed the plan for the direct examination with Rayborn by "asking him in essence every question I was going to ask him on the witness stand." Garts also practiced with Rayborn for cross-examination by asking him hypothetical questions similar to those Garts anticipated from the prosecution.

Garts could not, however, testify that Rayborn was similarly prepared for his second stint on the witness stand. Garts explained that because his co-counsel handled Rayborn's testimony at that trial, Garts could not provide any account of how Wilson prepared Rayborn for the second trial. Garts assumed that Wilson "probably" talked to Rayborn before the second trial, but he could provide no specifics about what topics that meeting would have covered or even when such a meeting would have taken place.

Finally, Garts claimed that the team was satisfied at the second trial with their limited examination approach. They believed that the tactic surprised the prosecutor and improved Rayborn's testimony overall. Garts explained that the team chose not to conduct a redirect examination because they believed further questions were "unnecessary" and would be "repetitious," given that the prosecutor had asked "every possible question" on cross-examination that the defense would have posed on redirect. The team did not believe Rayborn was impeached on cross-

examination, and they saw no need to rehabilitate Rayborn's credibility. In fact, the team thought

Rayborn answered the government's questions "as well as could be expected."

On December 15, 2009, the district court issued an order granting Rayborn's motion for

§ 2255 relief. Although the district court rejected Rayborn's other arguments, it found that he was

entitled to habeas relief based on his counsel's ineffective assistance. The district court reasoned that

the team's limited examination failed to address most of the evidence in the case, failed to provide

Rayborn with an opportunity to tell his own side of the story, and generally deprived him of his right

to offer testimony that was critical to his defense.

The government filed this timely appeal. Original jurisdiction exists pursuant to § 2255(a),

and we take jurisdiction under 28 U.S.C. §§ 2255(d) and 1291.

## ANALYSIS

**I.      Standard of Review**

In reviewing a § 2255 petition, this Court examines the district court's findings of fact for

clear error and its conclusions of law *de novo*. *Hamblen v. United States*, 591 F.3d 471, 473 (6th Cir.

2009). To warrant relief under § 2255, the petitioner must demonstrate the existence of "an error

of constitutional magnitude which had a substantial and injurious effect or influence" on the jury's

verdict. *Id*. (citing *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)).

In this case, we note that the same district court judge presided over all the proceedings since

July of 2000, that is, over both trials as well as the § 2255 evidentiary hearing. Accordingly, the

district court judge had a uniquely "advantageous perspective for determining the effectiveness of

11

counsel's conduct and whether any deficiencies were prejudicial" to Rayborn's trial. *Massaro v. United States*, 538 U.S. 500, 506 (2003).

## II. The *Strickland* Standard

In evaluating an ineffective assistance claim, this Court applies the familiar two-part performance and prejudice framework established in *Strickland v. Washington*:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687 (1984). "Ineffectiveness is not a question of basic, primary, or historical fact," but rather is "a mixed question of law and fact." *Id*. at 698.

We determine whether counsel's performance was deficient by reference to an objective standard of reasonableness, based on prevailing professional norms. *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997) (citing *Strickland*, 466 U.S. at 688). Counsel's performance must be assessed according to the time of representation, rather than viewed with the benefit of hindsight. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Because of the inherent difficulties in making this determination, we must "indulge a strong presumption that

12

counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. The burden rests on the defendant to overcome the presumption that the challenged conduct might be considered sound trial strategy. *Id*.

In order to demonstrate prejudice as a result of counsel's deficient performance, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome"—certainty of a different outcome is not required. *Id*. "Thus, analysis focusing solely on mere outcome determination, without attention to whether the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

## III.    Application

Although the district court considered Rayborn's ineffective assistance claim under a single theory for relief, his claim actually encompasses two distinct arguments: (1) whether he was adequately counseled and prepared before his trial, and (2) whether he suffered ineffective assistance at the trial itself by the way his testimony was conducted. We begin by taking up counsel's performance at trial, before discussing how the defense team settled on the limited examination approach.

### A.    Ineffective Assistance at Trial: Rayborn's Testimony

At the evidentiary hearing, Garts defended the abbreviated examination as a deliberate, tactical decision planned out by the team well in advance of the trial. He explained that the defense hoped to avoid tiring Rayborn on direct in order to restrain his emotions on cross-examination.

13

Strategic decisions made after a thorough investigation of the relevant law and facts are, of course, "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Likewise, whether to call a witness and how to conduct a witness' testimony are classic questions of trial strategy that merit *Strickland* deference. *See Harrison v. Motley*, 478 F.3d at 756. However, labeling a trial tactic "strategic" does not insulate it, perforce, from *Strickland* review. *Lovett v. Foltz*, 884 F.2d 579 (6th Cir. 1989) (per curiam). "[E]ven deliberate trial tactics may constitute ineffective assistance of counsel if they fall outside of the wide range of professionally competent assistance." *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984) (internal citation omitted).

The defense team's strategy, while unorthodox, was not unheard of. That being said, there is a clear reason why few defense attorneys decide to conduct their client's testimony in this manner—it is at best, objectively risky, and at worst, might under certain circumstances constitute ineffective assistance. At least three of our sister circuits have commented disapprovingly on the limited examination tactic. The Seventh Circuit has called the practice "probably deficient." *Patrasso v. Nelson*, 121 F.3d 297, 302 (7th Cir. 1997). Likewise, the Ninth Circuit granted habeas relief to a defendant whose counsel pursued an abbreviated examination technique that failed to ask whether the defendant committed the crime and that failed to inquire about the defendant's alibi. *Arellano v. Borg*, 154 F. App'x 9, 10–11 (9th Cir. 2005). The former Fifth Circuit also decried the limited examination strategy as "so unusual" as to "draw comment from the [trial] bench," but ultimately denied relief only because "the prosecuting attorney chose to stay out of the mousetrap and asked no questions." *Marino v. United States*, 600 F.2d 462, 463 (Former 5th Cir. 1979). This triad of cases strongly suggests that the team toed the line of professionally competent assistance.

14

Nevertheless, Rayborn was facing his second trial on these charges. The procedural history thus presents a peculiar wrinkle that may justify distinguishing this case from these otherwise persuasive precedents. On collateral review, Garts attempted to provide a credible strategic explanation for why the team felt a change to Rayborn's testimony was required. *Strickland* commands that we give Garts' questionable explanation due deference, even if we disagree with his assertion that the hung jury secured at the first trial was not a "successful" outcome for the defense.

What remains totally inexplicable, however, was the team's failure to conduct any redirect examination. By the time the cross-examination was completed, the prosecutor had already elicited the most "significant damaging information that [counsel] may have been trying to keep from the jury." *Arellano*, 154 F. App'x at 11. To the extent that the team feared Rayborn's fatigued and emotional reactions on the witness stand, the worst of the government's questions were behind him. Garts' explanation—that there was no need to perform a redirect because Rayborn had "performed as well as could be expected"—is clearly belied by the trial transcript.

In keeping with our adversarial trial system, the government's cross-examination was not designed to elicit responses that would be favorable to Rayborn's defense. Instead, the government highlighted the most incriminating evidence against Rayborn, while downplaying those facts that might raise reasonable doubt in the defense's favor. The prosecutor called Rayborn's credibility directly into question and deliberately curtailed Rayborn's ability to freely explain his side of the story. In doing so, the prosecutor successfully painted Rayborn as the only person with the ability to start the fire, the only person with unbridled control of the church's funds, and the only person with the motive to commit arson and fraud. Any reading of the transcript only shows Rayborn

15

admitting, time and again, the most incriminating and unflattering facts in the case. There is no way to read Rayborn's testimony as in any way beneficial to his defense. Garts' assertion that Rayborn emerged from the cross-examination without the need for rehabilitation strains credulity.

Moreover, as Garts himself emphasized, the defense team had a plan for Rayborn's testimony that went beyond merely proving that Rayborn could withstand the brunt of cross-examination. Rather, the team intended for Rayborn to provide the jurors with his defenses to the charges against him. Garts' recognition that this testimony was absolutely critical to mounting Rayborn's defense only underscores the absurdity of his claim that there were no further matters left to address on a redirect examination.

Rayborn could and should have provided, as he did at the first trial, testimony regarding his movements and his alibi for the day of the fire, his alternative theory for the source of the accelerants, his explanation about his prior personal expenditures, and his account of his financial relationship with his employer. Likewise, Rayborn should have defended himself against the mail fraud charges by explaining that he only submitted the insurance claim under his power of attorney, with the approval of the church board, and on the advice of the church's lawyers. None of these goals were accomplished when the defense rested its case. Instead, Rayborn was left abandoned and vulnerable, without a defense, offered up by his own attorneys as easy prey to any competent prosecutor.

We stress that our decision is not based on second-guessing a defensible, but unsuccessful strategic decision. Rather, Rayborn's testimony was clearly deficient and blatantly harmful to his defense. Although an avenue was readily accessible to rectify the damage that Rayborn's testimony

on cross-examination inflicted on his defense, counsel inexplicably ignored it. Whether due to insufficient preparation, ignorance, or an inability to improvise, the defense team's decisions consciously and indefensibly deprived Rayborn of his right to freely testify on his own behalf and to present his version of the facts.

**B.      Pretrial Ineffective Assistance: Advice on the Decision to Testify**

The Compulsory Process Clause of the Sixth Amendment guarantees a defendant the constitutional right to testify on his own behalf. *Rock v. Arkansas*, 483 U.S. 44, 52 (1987); *see also United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000) (recognizing that the Fifth and Fourteenth Amendments also protect a defendant's right to testify). This protection stems from our recognition that "the most important witness for the defense in many criminal cases is the defendant himself." *Rock*, 483 U.S. at 52. The defendant may choose not to testify, although that choice is ultimately "personal to the defendant" and may only be relinquished by the defendant's "knowing and intentional" waiver. *Webber*, 208 F.3d at 550–51.

To ensure that a defendant receives adequate counsel, defense counsel must do more than merely inform the defendant of his right to testify and his option to waive that right. Assuring that the defendant's decision is an informed one also necessitates that counsel discuss the strategic implications involved in the decision to testify. *Cannon v. Mullin*, 383 F.3d 1152, 1171 (10th Cir. 2004); *see also Harrison v. Motley*, 478 F.3d 750, 756 (6th Cir. 2007) ("[D]efense counsel has an obligation to discuss potential strategies with [the defendant]," including whether or not to testify.). Although counsel's advice typically includes a recommendation one way or the other, *see Cannon*, 383 F.3d at 1171, for purposes of our collateral review, the substantive recommendation matters less

17

than whether the options and underlying considerations were adequately laid out for the defendant's personal deliberation. *See Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983).

Applying this standard, it is clear from the testimony elicited at the evidentiary hearing that Rayborn did not receive constitutionally adequate pretrial counsel. Although the defense team discussed whether Rayborn ought to testify at the second trial, Garts described their discussion as the "same conversation" and their recommendations as the "same advice" provided to Rayborn before his first trial. Crediting Garts at his word, that discussion was plainly inadequate. Under the circumstances, the team was obligated to discuss the strategic implications of testifying *at a second trial*. That decision was a clearly different one from the decision to testify in the first instance. In many respects, Rayborn's testimony would have been, at best, a double-edged sword. While his prior testimony might have secured the first mistrial, it also provided the government with the opportunity to familiarize itself with his testimony and to adjust its prosecution accordingly. Counsel was obligated to explain this changed landscape, rather than simply relying on the discussion they provided to their client over a year earlier and at a significantly different stage of the case.

Likewise, the strategy to largely forego Rayborn's direct examination while leaving him vulnerable to the government's withering cross-examination was an obvious miscalculation that changed the rubric of Rayborn's decision. The team was therefore obligated to completely and fully lay out the advantages, disadvantages, and potential consequences of their imprudent suggestion. Because the team did not fulfill this duty, Rayborn simultaneously sacrificed both his constitutional right to remain silent and his constitutional right to testify on his own behalf. In exchange, he

unwittingly placed himself directly in the cross-hairs of the prosecutor's line of fire, without even his own words to defend himself. The defense team did not explain this perilous bargain to their client. Instead, Rayborn decided to testify a second time under the mistaken belief that he would simply deny the charges against him while avoiding the trauma of another cross-examination. Proper counsel would have disabused him of this misunderstanding.

The government would have us disregard the defense team's failures by pointing to Garts' self-serving prediction that "wild horses" could not have kept Rayborn from the stand. However, Rayborn's purported insistence on testifying has no bearing on his counsel's obligation to fairly and fully advise him of his choices. If anything, Rayborn's purported emotional volatility only heightened the team's responsibility to provide a dispassionate, thorough, and honest evaluation of the decision Rayborn faced. Regardless of whether the team thought another conversation with their client would be especially fruitful, that did not excuse them from their duty to accurately explain their revamped strategy. Nor did it relieve them from the requirement to caution Rayborn that testifying again was a substantially different decision that warranted further personal introspection.

Finally, having arrived at the decision to put Rayborn on the witness stand, his defense attorneys were obligated to prepare him for his testimony. *See Silva v. Woodford*, 279 F.3d 825, 833 (9th Cir. 2002). Garts claimed that he personally prepared Rayborn extensively before the first trial. However, Garts could not reassure the district court that his client received similar preparation prior to the second trial. Garts' explanation—that he assumed his co-counsel was charged with preparing Rayborn the second time—was not comforting to the district court, and it is not satisfactory to us now. It does not instill confidence in the constitutional adequacy of Rayborn's representation to

19

know that Rayborn's entire defense team was not familiar with the preparation they provided to their client on a matter of this magnitude.

### C.      Prejudice

Having found counsel's performance deficient, we must next decide whether the defense team's errors ultimately prejudiced Rayborn's right to a fair trial. Unique to this case, the first trial provides us with a blueprint of what could have happened had Rayborn been allowed to testify fully on his own behalf. The different outcomes at the two trials provide a reasonable basis to conclude that there is a reasonable probability that Rayborn's testimony might have swayed the jury's verdict in his favor.

Moreover, the case against Rayborn was hardly overwhelming. *See Hodge v. Hurley*, 426 F.3d 368, 375 n.17 (6th Cir. 2005) ("[T]he prejudice determination is necessarily affected by the quantity and quality of other evidence against the defendant."). The government's case was entirely circumstantial and lacked any direct or physical evidence linking Rayborn to the fire or even definitively proving that the fire was intentionally set. *See Rayborn II*, 495 F.3d at 338. As for the mail fraud counts, Rayborn's actions were clear, but his motives were hotly contested. Without convincing the jury that the Rule 404(b) evidence proved motive, the government had no case against Rayborn on the mail fraud charges. *Id*. at 342–43.

The government now argues that Rayborn cannot possibly show prejudice because his testimony would only have corroborated other evidence that was already presented to the jury. *See United States v. Harris*, 408 F.3d 186, 192 (5th Cir. 2005). However, the government ignores the fact that it is often the defendant, above all others, who is the most influential witness to a jury. *See*

*Ferguson v. Georgia*, 365 U.S. 570, 582 (1961). Such was the case here, where the prosecution raised crucial questions that only Rayborn could answer. For instance, Rayborn was the only witness who could provide a complete narrative of his movements on the day of the fire. Only Rayborn could fully explain his thoughts and motivations for signing the insurance forms. Rayborn was the only person who could justify and combat the government's aspersions of financial chicanery. These were fruitful subjects for direct and redirect examination, but all were deliberately neglected by the defense. Notably, the mail fraud counts went completely unaddressed by the defense team.

The defense team's handling of Rayborn's testimony might not have been so egregiously flawed as to render the team's efforts a "complete failure" or to deem counsel "constructively absent" from the second trial. *See Harrison v. Motley*, 478 F.3d 750, 754–55 (6th Cir. 2007)*; McDowell v. Kingston*, 497 F.3d 757, 763–65 (7th Cir. 2007). However, the defense team's choices went far beyond excusable missteps in leading Rayborn through his testimony. *Cf. McDowell*, 497 F.3d at 760; *Sanchez v. United States*, 398 F.2d 799, 800 (9th Cir. 1968). Rather, the defense team failed to protect Rayborn's constitutional rights at the critical stage of a closely contested trial. "No conceivable, tactical justification" can undo the harm inflicted by improperly conducting the testimony of "*the* key witness in the case." *Higgins v. Renico*, 470 F.3d 624, 633–35 (6th Cir. 2006) (emphasis in original); *see also Schell v. Witek*, 218 F.3d 1017, 1029–30 (9th Cir. 2000) (finding prejudice where counsel mishandled "the only evidence" linking the defendant to the crime scene). The team was well aware of the significance of their client's testimony. In fact, according to Garts, the team believed that they had little else to combat the prosecution. *See Gardner v. Galetka*, 568 F.3d 862, 876–77 (10th Cir. 2009). Given the importance of Rayborn's testimony and the obvious

impact its mishandling had on the outcome of the trial, Rayborn has also satisfied *Strickland*'s prejudice prong.

## CONCLUSION

This case is in many respects an unusual one, limited to its own peculiar facts and its long procedural history. However, the errors committed by defense counsel are clear. Owing to the defense team's incompetent trial strategy, Rayborn was forced to admit incriminating facts in a vacuum, including that he had sole access to the church, that he was alone for stretches of time on the day of the fire, that he had unfettered control of church finances, that he wielded his financial authority in a questionable manner, and that he personally signed the insurance forms. What counsel failed to elicit after these admissions, however, were all the facts that Rayborn could have provided to explain his behavior or to cast his incriminating responses into doubt. The jury did not hear from Rayborn that he could precisely describe his whereabouts for most of the day, that he was asleep on his couch when the fire was discovered, that he immediately rushed to the church to try and save some of its valuable assets, that the church board knew of his prior expenditures and never accused him of misusing church funds, and that he signed the insurance forms only at the advice of attorneys, with the approval of the church board, and pursuant to a valid and legal power of attorney. This informational imbalance was the direct product of deficient advice, inadequate preparation, and indefensible choices of Rayborn's own defense counsel. As a result, we agree with the district court that defense counsel's serious errors denied Rayborn the right to a fair trial and his convictions must be vacated as a result.

For the foregoing reasons, we **AFFIRM** the decision of the district court and grant Rayborn's

motion to vacate his convictions and sentence.