RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0015p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

PATRICK LEONARD,

               *Petitioner-Appellant*,

     *v.*

WARDEN, OHIO STATE PENITENTIARY,

               *Respondent-Appellee*.

> No. 15-3653

Appeal from the United States District Court for
the Southern District of Ohio at Cincinnati.
No. 1:09-cv-00056—Susan J. Dlott, District Judge.

Argued: October 20, 2016

Decided and Filed: January 23, 2017

Before: CLAY, McKEAGUE, and KETHLEDGE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Nadia V. Wood, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Sharon A. Hicks, Jacob A. Cairns, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. David M. Henry, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

───────────────

## OPINION

───────────────

    CLAY, Circuit Judge. Petitioner Patrick Leonard, who was convicted and sentenced to death on June 28, 2001, appeals the order of the district court denying his petition for a writ of

habeas corpus, which he had sought pursuant to 28 U.S.C. § 2254.  For the reasons that follow, we **AFFIRM** the district court's order.

## BACKGROUND

### Factual Background

In its decision affirming Leonard's conviction and sentence on direct appeal, the Ohio Supreme Court described the facts giving rise to this case as follows:

> On July 29, 2000, Patrick T. Leonard, defendant-appellant, followed Dawn Flick, his former fiancée, while she was driving her car, forced her to a stop, and ordered her to return to her home.  Leonard followed Flick to her house, and, once inside, Leonard handcuffed Flick, attempted to rape her, and then shot her three times in the head.  Leonard was convicted of the aggravated murder, attempted rape, and kidnapping of Flick and was sentenced to death.
>
> Leonard and Flick became engaged in the fall of 1995.  During their engagement, Leonard fathered a son by Penny McBride.  Leonard and Flick ended their engagement in 1998 but continued to date.  Leonard also continued his relationship with McBride.  Approximately nine months before Flick was murdered, a second child was born to Leonard and McBride.  Leonard tried to conceal from Flick and others that he was the child's father.
>
> The evidence presented at Leonard's trial indicated that Flick had intended to end her relationship with Leonard.  In his confession, Leonard stated that he had a "broken heart" because he was losing Flick.  On Friday, July 28, 2000, the day before the murder, Leonard told Alvie Woods, a friend of Leonard's and Flick's, that if he caught Flick "fooling around" with anyone, Leonard would kill somebody.  According to Woods, Leonard had said, "[I]f I can't have her, no one can."
>
> Flick tended bar at her family's restaurant, Les Flick's Home Like Inn, on the evening of July 28 and early morning of July 29.  After the restaurant closed for the night, Flick drove to Snow's Lake Bar to meet some friends.  Leonard followed Flick and, according to his confession, "got her to pull over."  Leonard then confronted Flick about her earlier statement that she would be staying home for the evening.  Leonard left Flick alone after she agreed to call him when she returned home.  When she arrived at Snow's, Flick appeared upset, according to Woods, Deborah Schroeder, and Reva Ketterer, and she told them that Leonard had just run her car off the road.
>
> When Snow's closed for the night, Flick planned to go to the house of her friend, Ryan Gries.  Leonard followed Flick as she drove to Gries's house and again

stopped her car. Leonard ordered Flick to return to her home, and he followed her there. Once inside, Leonard handcuffed her wrists. Leonard then pointed a gun at Flick as she called to tell Gries that she was not coming to his house. During their telephone conversation, Gries was able to elicit from Flick that she was with Leonard and was in danger.

Gries and his friend Frank Minges rushed to Flick's house. When Leonard heard Gries's truck drive up, he shot Flick three times in the head. He then fired through the door, striking Gries in the chest. Gries and Minges left to call the police, and Leonard fled in his truck.

Leonard then called a friend, Sergeant Nick Chaplin, a deputy sheriff in Campbell County, Kentucky. Leonard told Chaplin that he had shot and killed Flick, and he agreed to surrender to Chaplin. Leonard drove to Kentucky, where he was taken into custody.

After being advised of his *Miranda* rights, Leonard gave a taped statement confessing to Flick's murder. In his confession, Leonard admitted that before shooting Flick, he had restrained her with handcuffs. Leonard said that he and Flick had talked about "making love [and had] decided to do that on the floor." Leonard said that when he had heard Gries's truck drive up, he jumped up off of Flick, pulled his pants up, and shot Flick three times in the head. Leonard also admitted having shot at Gries and Minges through Flick's front door.

Police officers investigating the shooting found Flick's partially clothed body lying in a pool of blood in her living room. Flick's panties were down to her thighs, one pant leg was completely off, the other pant leg was around her calf, and one shoe was off. Her wrists were bound by handcuffs.

Dr. Robert Pfalsgraf, chief deputy coroner, determined that the cause of death was a gunshot wound to the head. Flick had been shot once in the face, once in the back of the head, and once in the back of her neck at the hairline. The shot to the back of Flick's head was fatal.

Pfalsgraf found no injuries to Flick's vagina or anus and no semen in those areas. Pfalsgraf noted, however, that this lack of evidence did not preclude a finding that Leonard had penetrated Flick.

Pfalsgraf also testified that the pattern of bruising on Flick's wrists corresponded to the handcuffs found on her wrists. Petechiae were found on her face and neck, indicating ruptured blood vessels caused by strangulation. Flick also had ligature bruising on her neck that matched the pattern of the necklace she was wearing. Based on these injuries, the coroner concluded that Flick had been strangled and had struggled with her assailant while she was handcuffed.

Leonard was indicted on two counts of aggravated murder. The first count charged Leonard with purposely causing Flick's death while committing or attempting to commit rape. R.C. 2903.01(B). The second count charged Leonard with purposely and with prior calculation and design causing Flick's death. R.C. 2903.01(A). Leonard was also indicted for attempted murder in Counts Three and Four (R.C. 2903.02 and 2923.02), rape in Count Five (R.C. 2907.02[A] [2]), and kidnapping in Count Six (R.C. 2905.01[A] [2] ).

The aggravated-murder counts each contained two death-penalty specifications. The first specification charged aggravated murder as part of a course of conduct to kill or attempt to kill two or more persons. R.C. 2929.04(A)(5). The second specification charged aggravated murder during a rape or an attempted rape. R.C. 2929.04(A)(7). Gun specifications were included with all counts except Count Six, kidnapping.

At trial, the defense presented testimony from five witnesses and other documentary evidence. Leonard did not testify. During defense counsel's opening statement, counsel conceded that Leonard had shot Flick. However, the defense's theory was that Leonard had been trying to salvage his relationship with Flick, had not intended to kill her, and had not acted with prior calculation and design. The defense also contested the charges of rape and kidnapping and denied that Leonard had attempted to murder Gries and Minges.

The defense introduced evidence to show that Leonard had purchased a planter with flowers from Renck's Garden Center and had given it to Flick as a gift on the afternoon before the murder.

Eddie Sayers, an employee of Sam's Corner Store in New Baltimore, Ohio, testified that both Leonard and Flick had been in the store the day before the murder: Leonard in the morning, and Flick in the afternoon. Sayers testified that Leonard had not seemed upset and that Flick had appeared happy. On cross-examination, Sayers stated that he had not seen Leonard and Flick together that day and admitted that he did not know how Leonard acted later that day.

Rick Schoeny, a life-long friend of Leonard's, testified that Leonard always had guns and carried a gun in his jacket. Leonard's brother Ted testified that Leonard had sometimes threatened to kill people when he was upset. Ted noted, however, that this was "the way [Leonard] always voiced his opinion" and that these threats were never taken seriously.

Other testimony indicated that Leonard and Flick had spent time together in the days leading up to the murder and had plans to go horseback riding the following day. In his confession, Leonard claimed that he and Flick had begun to engage in consensual sex before he shot her. He also said that he "went blank" just before shooting her.

Leonard also confessed to having shot at Flick's front door to keep Gries and Minges from entering the home. Evidence at trial indicated that Leonard had fired only one shot at the door.

*State v. Leonard*, 818 N.E.2d 229, 241–43 (Ohio 2004).

**Procedural History**

On August 7, 2000, a grand jury in Hamilton County, Ohio indicted Leonard on two counts of aggravated murder with capital specifications, two counts of attempted murder, and one count each of rape and kidnapping. Trial commenced on May 15, 2001. On May 24, 2001, the jury found Leonard guilty of both counts of aggravated murder, one count of kidnapping, one count of attempted rape, and two counts of felonious assault. The jury acquitted Leonard of rape and both counts of attempted murder; the attempted rape and felonious assault convictions were for lesser included offenses. The penalty phase of the trial began on May 29, 2001. On May 31, 2001, the jury recommended a death sentence. The trial court adopted the jury's recommendation and imposed a death sentence on June 28, 2001.

Leonard appealed directly to the Ohio Supreme Court, which affirmed his convictions and sentence in 2004. *Leonard*, 818 N.E.2d 229. In 2005, Leonard attempted to reopen his direct appeal pursuant to Ohio S. Ct. Prac. R. XI. The Ohio Supreme Court denied the application in a summary order on June 29, 2005. *State v. Leonard*, 830 N.E.2d 342 (Ohio 2005).

In 2002, while his direct appeal was being briefed to the Ohio Supreme Court but before it was heard, Leonard initiated post-conviction review proceedings in the state trial court. On June 3, 2003, the trial court denied relief as to all claims. The Ohio Court of Appeals affirmed the denial of relief on all but Leonard's claim regarding the use of a stun belt at trial, which it remanded for an evidentiary hearing. *State v. Leonard*, 813 N.E.2d 50 (Ohio Ct. App. 2004). The Ohio Supreme Court declined to accept further appeal or cross-appeal. *State v. Leonard*, 821 N.E.2d 577 (Ohio 2005). After a lengthy evidentiary hearing, the trial court on remand denied relief as to the stun belt claim, and the Ohio Court of Appeals affirmed. *State v. Leonard*, No. C-061025, 2007 WL 4562881 (Ohio Ct. App. Dec. 31, 2007). The Ohio Supreme Court declined jurisdiction and dismissed the appeal as not presenting any substantial constitutional

question.  *State v. Leonard*, 889 N.E.2d 1025 (Ohio 2008).  The United States Supreme Court denied certiorari.  *Leonard v. Ohio*, 555 U.S. 1075 (2008).

On July 8, 2009, Leonard filed a petition for habeas relief in the United States District Court for the Southern District of Ohio alleging some thirty grounds for relief.  In March 2013, the magistrate judge issued a report recommending that the petition be denied.  The warden raised no objections to the magistrate judge's report and recommendation.  Leonard filed objections to the report and recommendation.  In May 2014, the magistrate judge issued a supplemental report and recommendation.  Leonard filed objections.  In May 14, 2015, the district court issued an opinion and order in which it adopted the magistrate judge's reports and recommendations, overruled Leonard's objections, and denied the petition.  The district court certified nine claims for appellate review:  (1) whether the trial court's decision to have Leonard wear a stun belt denied him a fundamentally fair trial; (2) whether prosecutorial misconduct throughout the guilt and penalty phases denied Leonard a fundamentally fair trial; (3) whether trial counsel labored under a conflict of interest and therefore denied Leonard the effective assistance of counsel; (4) whether trial counsel was ineffective during the guilt phase concerning the failure to impeach Gries and Minges, the lack of an investigation, and the failure to present Hutcherson's testimony; (5) whether trial counsel was ineffective during the penalty phase concerning the scope of the mitigation investigation; (6) whether Ohio's death penalty scheme provides a constitutionally adequate system of appellate and proportionality review; (7) whether Leonard's rape or attempted rape convictions were supported by sufficient evidence and consistent with the manifest weight of the evidence; (8) whether Ohio's post-conviction process provides a constitutionally adequate opportunity for review of federal constitutional claims; and (9) whether Ohio's death penalty scheme is unconstitutional.  Judgment was entered that same day.  Leonard filed a timely appeal challenging the district court's decisions on all counts except for his constitutional challenge against the death penalty.

**DISCUSSION**

**I. Standard of Review**

We review a district court's grant or denial of a petition for a writ of habeas corpus *de novo*. *Cleveland v. Bradshaw*, 693 F.3d 626, 631 (6th Cir. 2012). The district court's findings of fact are reviewed for clear error and its legal conclusions on mixed questions of law and fact are reviewed *de novo*. *Gumm v. Mitchell*, 775 F.3d 345, 359–60 (6th Cir. 2014). Leonard filed his habeas corpus petition in July 2009, so it is subject to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which became effective on April 24, 1996. *See Keeling v. Warden*, 673 F.3d 452, 458 (6th Cir. 2012). Under AEDPA, a writ may not be granted unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A federal habeas court may grant the writ under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts." *Van Tran v. Colson*, 764 F.3d 594, 604 (6th Cir. 2014) (citing *Brown v. Payton*, 544 U.S. 133, 141 (2005)). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case." *Henley v. Bell*, 487 F.3d 379, 384 (6th Cir. 2007) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fair-minded disagreement on the question." *White v. Woodall*, 134 S. Ct. 1697, 1706–07 (2014). "[T]he habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct." *Henley*, 487 F.3d at 384 (citing 28 U.S.C. § 2254(e)(1)).

**II. The Requirement to Wear a Stun Belt**

Leonard's first ground for habeas relief concerns the use of a stun belt at trial, which he was made to wear beneath his clothes. Leonard contends that the trial court's order requiring him to wear a stun belt throughout trial without conducting an individualized determination of dangerousness denied him due process. Prior to trial, counsel for Leonard filed motions with the trial court requesting that Leonard be able to appear without restraints and in civilian clothing. Without conducting an individualized determination assessing the necessity of such restraints, the trial court adopted the recommendation of the sheriff's department and required Leonard to wear a stun belt. Throughout trial, Leonard wore a stun belt strapped to his lower back, over which he wore a large blue button-down shirt.

Leonard first attacked the constitutionality of the Ohio trial court's decision to compel him to wear a stun belt in his post-conviction petition with the Ohio state court. After the trial court denied relief, the Ohio Court of Appeals remanded on this issue. On remand the trial court held a lengthy evidentiary hearing and determined that the stun belt was at most visible to the jury for twelve seconds throughout the multi-day trial; and even then only in the form of an unidentified bulge revealed through his shirt. The trial court found no indication that the jury was aware that the bulge was in fact a stun belt. Nor did the court find that the stun belt had any impact upon Leonard's ability to communicate with counsel or assist in his own defense. On appeal, the Ohio Court of Appeals affirmed the decision on a separate basis finding that "[t]he record of the hearing provides competent and credible evidence to support the common pleas court's conclusion that the circumstances surrounding Leonard's trial demonstrated a compelling need for exceptional security in the form of a stun belt." *Leonard*, 2007 WL 4562881, at *3.

In *Holbrook v. Flynn*, the Supreme Court set forth the guidelines for a federal court to review a challenge to extraordinary security measures undertaken during a criminal trial:

> All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

475 U.S. 560, 572 (1986). Addressing the use of physical restraints on a criminal defendant during trial, the Supreme Court held in *Deck v. Missouri* that "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest' . . . such as the interest in courtroom security—specific to the defendant on trial." 544 U.S. 622, 624 (2005). On the basis of *Deck*, Leonard contends that the trial court deprived him of his right to a fair trial by failing to perform an individualized determination prior to forcing him to wear restraints. We disagree.

At the outset, we note that the Ohio Court of Appeal's legal analysis was incorrect with respect to the trial court's decision to compel Leonard to wear restraints. The Constitution mandates an individualized assessment in *every* case prior to the imposition of visible restraints upon a defendant. For purposes of this appeal, however, "visible" marks the key inquiry for us because a claim based on *Deck* "rises or falls on the question of whether the stun belt was visible to the jury." *Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir. 2009); *see also Mendoza v. Berghuis*, 544 F.3d 650 (6th Cir. 2008) (denying relief where the petitioner's shackles were rendered invisible to the jury by brown paper surrounding counsel table). *Earhart* reasoned that if the stun belt were "a visible restraint, due process mandates an individualized finding of necessity before the state courts could require" its use, but if it were not visible, "there is not a violation of clearly established federal law sufficient to grant the writ." 589 F.3d at 349 (citing *Mendoza*, 544 F.3d at 654). *Earhart* rejected the petitioner's assertion that the stun belt had been visible to the jury where the state appellate court had found as a factual matter that the belt was not visible, and denied relief on this claim. *Id.*; *see also Adams v. Bradshaw*, 826 F.3d 306, 317 (6th Cir. 2016) ("Here, at least in the guilt phase, there is no evidence that the jury knew that [the petitioner] was wearing a stun belt").

Even though the Ohio Court of Appeals appears to have incorrectly framed the issue, it did not disturb the findings of the post-conviction trial court, which found no evidence that the jury actually saw the stun belt, much less recognized it as a restraint. Accordingly, Leonard still cannot establish grounds for relief under AEDPA. In reviewing the pooled video evidence and the affidavit testimony from the state trial court, we see no basis for overturning the trial court's factual findings. The bulge created by a stun belt appears to have been at most only momentarily

visible. Nor do we find any indication, and certainly are not convinced by the evidence put forward by Leonard, that a jury—absent pure speculation—could have realized that this bulge constituted a restraint. Absent such evidence, we conclude that Leonard's stun belt was not a visible restraint. Conversely, we cannot find any Supreme Court precedent that speaks to the psychological impact of non-visible restraints and their interference with a defendant's ability to present a fair defense. Consequently, Leonard has not established an unreasonable application of clearly established federal law.

Moreover, even assuming that any restraints were visible to the jury, this Court has previously engaged in harmless error review, affirming sentences when evidence of guilt is "overwhelming." *Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005) (shackles created constitutional violation but any error was harmless in light of overwhelming evidence of guilt); *Robinson v. Gundy*, 174 F. App'x 886, 893 (6th Cir. 2006) (same). Overwhelming evidence, including Leonard's own confession and evidence collected from the crime scene, supported the convictions here. Accordingly, this claim for relief was properly denied.

## III. Trial Counsel's Conflict of Interests

Leonard contends that he was denied his Sixth Amendment right to conflict-free counsel. Specifically, he asserts that trial counsel, Michael H. Strong and William M. Welsh, labored under the following conflicts of interest: (1) they were retained and paid by Leonard's family; (2) Strong was a personal friend of the Leonard family; and (3) they represented LTS Builders, a company owned by two of Leonard's brothers, in civil suits brought by the Flick estate and by Gries and Minges while counsel also represented Leonard in his criminal action.

On state post-conviction review, the trial court denied this claim. On appeal, the Ohio Court of Appeals affirmed. *Leonard*, 813 N.E.2d at 58–60. The court determined that the trial court was under no obligation to address the possibility of a conflict of interest as "the defendant offered no objection to his counsel's dual representation, and the record of the proceedings at trial contained no suggestion of a conflict of interest." *Id*. at 59. The court also determined that trial counsel's concurrent representation did not constitute an actual conflict because "the evidence disclosed no duty incurred by counsel in defending the company in the civil action that

might be said to have been adverse to or in conflict with counsel's duties in defending Leonard against the criminal charges." *Id.* Additionally, the court found that the personal relationship between trial counsel and the Leonard family did not constitute an actual conflict of interest because Leonard did not present any evidence of the "critical information" that only counsel could have provided. *Id.* at 60. Finally, the court concluded that trial counsel's retention by the Leonard family was not an actual conflict of interest because the trial record "demonstrated that counsel had presented the case in mitigation competently in view of the facts available to them. And nothing in the evidentiary material submitted by Leonard in support [of] his claim suggested the contrary." *Id.*

A petitioner asserting that he received ineffective assistance of counsel must demonstrate that counsel performed deficiently and that the deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, a petitioner must "show[] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* To demonstrate prejudice, a petitioner must "show[] that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel and, in doing so, secures him the assistance of counsel free from conflicts of interest.

When a petitioner asserts counsel's ineffectiveness arising from a conflict of interest, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 345–50 (1980)). To prevail on a claim that he was denied his right to conflict-free counsel, a defendant must demonstrate "an actual conflict of interest." *Wood v. Georgia*, 450 U.S. 261, 273 (1981). An "actual conflict," for purposes of the Sixth Amendment, is "a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). "[T]he possibility of conflict is insufficient to impugn a criminal conviction." *Sullivan*, 446 U.S. at 350. This Court has observed that "[i]n *Mickens v. Taylor*, the Supreme Court found that the presumed standard of *Sullivan* was clearly established only in the situation of a conflict of interest due to multiple

concurrent representation," and therefore "has consistently held that, for § 2254 cases, the *Sullivan* standard does not apply to claims of conflict of interest other than multiple concurrent representation; in such cases, including successive representation, the *Strickland* standard applies." *Stewart v. Wolfenbarger*, 468 F.3d 338, 350–51 (6th Cir. 2006) (collecting cases).

The Supreme Court in *Mickens* stated that "as a general matter, a defendant alleging a Sixth Amendment violation must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 535 U.S. at 166. The Supreme Court recognized, however, that there are exceptions to this general standard where the burden is lessened. For example, "a defendant who shows that a conflict of interest *actually affected the adequacy of his representation* need not demonstrate prejudice in order to obtain relief." *Id.* at 171 (quoting *Sullivan*, 446 U.S. at 349–50) (emphasis added). However, the Supreme Court stated that "when the trial judge is not aware of the conflict (and thus not obligated to inquire) . . . prejudice will be presumed only if the conflict has significantly affected counsel's performance—thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown." *Id.* at 172. Given the fact that the trial judge was not aware of the conflicts asserted and Leonard neglected to raise any such issues during his trial, Leonard must establish both that his trial counsel suffered from an actual conflict of interest and that the conflict of interest adversely affected the quality of representation. With this in mind, we review each putative conflict in turn.

### 1. The payment of Leonard's attorneys by the Leonard family

Leonard first asserts that because his attorneys were paid by his family, this created a conflict of interest. According to Leonard, a successful mitigation strategy required trial counsel to present unsavory facts about the Leonard family to show that family dysfunction contributed to his decision to kill Flick. He contends that trial counsel deliberately selected a mitigation strategy so as to avoid embarrassing or offending the individuals responsible for paying their legal fees. Even assuming the plausibility of such a theory, which we by no means endorse, ample evidence exists in the record to show that the requested evidence was in fact presented to the jury.

James Hawkins, M.D., a board-certified psychiatrist qualified in forensic psychiatry, testified at the penalty phase that trial counsel retained him to evaluate Leonard. Dr. Hawkins met with Leonard twice and administered psychological tests to him. Leonard earned the following scores on an IQ test: performance, 117; verbal, 93; and full-scale, 103; Dr. Hawkins explained the results: "That's a pretty big spread and you normally will see that in people who have a learning disability. They don't learn through their senses, through their eyes and their ears, as well as they learn through their hands." (R. 61-15, Tr., PageID # 8590–91). According to Dr. Hawkins, Leonard's results showed that he "is a bit mistrustful and suspicious," "like[s] to be outdoors," "tends to bottle up his emotions," "feels somewhat personally inadequate," and "is a loner, that he is sensitive to criticism, and that he's sensitive to humiliation and rejection." (*Id.* at 8592–93). Dr. Hawkins attributed those characteristics to Leonard's upbringing:

> I said—or believe that he never was allowed to learn how to deal with anger. So he bottled it up. And he, as a kid, he was raised in a rigid household, in that emotions just weren't allowed. The best he could do was wrestle with his brothers on the living room floor, never got in a fight, never crossed his mother. He was pretty much a regimented, rigid kid.

(*Id.* at 8596.)

In the state post-conviction proceedings, Nancy J. Schindler, Psy.D., conducted a psychological evaluation of Leonard and disclosed her findings in a written report. Dr. Schindler stated:

> Patrick has a diagnosable learning disability which contributed to his feeling inadequate and feeling rejected in his family and at school. In addition, Patrick's learning style interfered with his processing verbal information in many areas. Patrick grew up in a family that tended to be emotionally distant and could not provide emotional constancy to allow Patrick to develop a secure sense of himself. Nor could he develop internal processes for modulating intense emotions. Patrick's parents, in particular his mother, substituted religion and religious functions for emotional holding and availability. This substitution caused Patrick to be more alienated from his internal feeling experience.

(R. 61-4, Tr., PageID # 4010.)

The Ohio Court of Appeals found "nothing in the evidentiary material submitted by Leonard in support of his claim suggested" that trial counsel had performed their mitigation duties less than competently on the available facts and that Leonard had accordingly "failed to

demonstrate a causative link between the alleged conflict of interest and an inadequacy in his counsel's representation." *Leonard*, 813 N.E.2d at 60. The decision of the Ohio Court of Appeals regarding the evidence submitted at the post-conviction stage—consisting largely of unpersuasive, partly-handwritten affidavits from Leonard's family—is not at all unreasonable. Certainly, we recognize that third party funding of litigation can create adverse incentives throughout any given trial. But on this record, the possibility that Leonard's counsel altered their choice of strategy is the sort of "mere theoretical division of loyalties" that *Mickens* dismissed as insufficient to reverse a conviction. 535 U.S. at 171. The Ohio Court of Appeals did not unreasonably apply federal law in denying this theory. Nor has Leonard presented evidence that was substantially different to that presented at trial by Dr. Hawkins. Therefore, he is not entitled to relief. *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing.").

## 2. Leonard's trial counsel's status as a family friend

Leonard next argues that because Strong, an old summer camp friend of Leonard's who had personal information about the family, could not testify on Leonard's behalf, the jury was deprived of significant mitigation testimony concerning Leonard's upbringing that would have helped explain the murder. Leonard neglects to specify for this Court precisely what information he believes the jury was deprived of. In any event, the record contains trial testimony from two witnesses who had a relationship with Leonard's family and were not family members—both individuals even met Leonard at summer camp.

First, Dale Siegel testified that he was not Leonard's brother and first met Leonard in 1984 when he worked in the riding department of a summer camp called Fort Scott, which Leonard attended. Siegel testified that he visited the Leonard family in Indianapolis: "I went up to see a few of the family members, all of them. I got to be good friends with all of them, as a matter of fact. But specifically two people I worked with, which was Ted and Sue Leonard." (R. 61-15, Tr., PageID # 8683.) Siegel stated that "[e]very time I was there they would have foster kids, anywhere, to my knowledge, from infants up to age five or so . . . . All the kids were expected to help in the care of the foster kids" and that Leonard "had a willingness to always

take care of them, as did all the kids. They were brought up that way." (*Id.* at 8684.) After Leonard moved to Cincinnati, Siegel saw him "a couple of times a year, generally at [Leonard] family gatherings, which they graciously invited me to many of those, and other Fort Scott gatherings, that happened a couple times a year." (*Id.* at 8685.)

Patrick Michael O'Neill, a lawyer, testified he has known the Leonard family since he was sixteen years old and at one time worked as a carpenter for Steve and Dave Leonard before attending law school. He offered his insight about Leonard and Leonard's family:

> He was a good kid. I mean, the family was a good family. They are good. You know, I'm from a large Catholic family. Pat was from a large Catholic family and had a lot in common. I knew—like I said, I know most of his brothers and sisters. They are good people. I knew Pat when Pat—or started to get to know Pat a little better when he actually moved from—to Cincinnati from Indianapolis and began working with him. But I knew Pat to be a good and decent person.

(R. 61-15, Tr., PageID # 8691.) O'Neill also provided insight into working with Leonard while both worked for Leonard's brothers:

> Pat started out with very limited knowledge of carpentry but his brother was very good with him. And we all knew Pat and we all knew the family. So we weren't probably as tough on him as we were on other laborers at other times.

(*Id.* at 8692.)

Leonard has, again, failed to demonstrate that trial counsel performed deficiently. It is unclear what insight, if any, Strong could offer and how this would have impacted the trial in a material way.

### 3. Trial counsel's alleged conflict of interest stemming from an unsettled civil case

Leonard claims that he received inadequate representation from trial counsel because they simultaneously represented LTS Builders—a company owned by Leonard's two brothers— in a civil suit. Prior to Leonard's criminal trial, Dawn Flick's estate and Gries and Minges filed separate civil lawsuits against both Leonard and his brothers' closely held corporation, LTS Builders, based on the theory that Leonard had been driving an LTS vehicle on the night of the murder. The docket sheet for the Gries/Minges suit shows that the civil suit was dismissed as to LTS on January 31, 2001, several months before the criminal trial began. However, the Flick

suit was still pending at trial, and was voluntarily dismissed by the Flick estate as to LTS Builders on June 6, 2001, just six days after the jury returned a death sentence in the criminal trial. Thus, given the timeline, Leonard correctly points out that the Ohio Court of Appeals incorrectly stated that "the plaintiffs in each action had voluntarily dismissed their claims against the company before trial." *Leonard*, 813 N.E.2d at 59. The Ohio Court of Appeals appears to have premised its decision on an erroneous finding that both lawsuits had been dismissed prior to trial. At the time of trial, Welsh and Strong were representing Leonard in his criminal case; Leonard in the Gries/Minges lawsuit; and Leonard and LTS Builders simultaneously in the Flick estate lawsuit.

On appeal, Leonard attempts to argue that his counsel's real loyalty, including during the criminal trial, was to LTS, and the division of loyalties caused counsel's "fail[ure] to investigate and elicit mitigation testimony from a major shareholder and a director of LTS, Ted Leonard, with whom he [had] worked closely as corporate counsel for the past eight years." (Pet.'s Br. at 36). However, Leonard never explains how obtaining dismissal of a civil suit against LTS Builders created an adverse interest for trial counsel in Leonard's criminal suit. "To prove actual conflict, a defendant must 'point to specific instances in the record' and 'make a factual showing of inconsistent interests.'" *United States v. Kilpatrick*, 798 F.3d 365, 375 (6th Cir. 2015) (quoting *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987)). Perhaps, as a matter of professional integrity, trial counsel should not have represented LTS Builders in the civil suit. But Leonard offers no more than speculative arguments in service of his broader theory that counsel's mitigation strategy was woefully deficient. For purposes of habeas review, however, Leonard does not point to any Supreme Court case that has held this sort of simultaneous representation was improper. And he cannot establish that the purported conflict actually "affected the adequacy" of counsel's representation, as required under *Mickens*. 535 U.S. at 168. Therefore, we reject this claim.

## IV. Ineffective Assistance of Counsel

Leonard next argues that trial counsel were ineffective. He proffers several theories, regarding both the guilt phase and the penalty phase of the trial. First, Leonard claims that trial counsel were ineffective by failing to impeach the testimony of Gries and Minges, and failing to

investigate and present evidence regarding the relationships between Leonard and Flick, as well as between Gries and Flick. Second, Leonard contends that during the mitigation phase, counsel were ineffective because counsel neither retained a mitigation specialist to investigate and present mitigation evidence nor prepared Dr. Hawkins to testify. We reject both claims.

Ineffective assistance of counsel claims are subject to the standard of *Strickland*, which requires a showing of deficient attorney performance and resulting prejudice rendering the result of the proceeding unreliable. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quoting *Strickland*, 466 U.S. at 690). When considering such a claim in the sentencing context, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balancing of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

> On direct appeal, the Ohio Supreme Court ruled that:

> Leonard also argues that counsel failed to effectively cross-examine Gries and Minges. The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. See *State v. Campbell,* 90 Ohio St.3d at 339, 738 N.E.2d 1178; *State v. Otte,* 74 Ohio St.3d at 565, 660 N.E.2d 711; accord *State v. Bradley,* 42 Ohio St.3d at 142–144, 538 N.E.2d 373. Leonard claims that there were several inconsistencies in the testimony of Gries and Minges and that more effective cross-examinations could have bolstered the defense's argument that Flick had consented to having sex with Leonard. But Leonard does not explain what the alleged inconsistencies are or how they could have shown that Flick had consented. Nor are the inconsistencies clear from the record. Thus, we reject Leonard's argument.

*Leonard*, 818 N.E.2d at 262–64.

As a threshold matter, because the state court correctly identified and attempted to apply the *Strickland* standard, under AEDPA, we apply a doubly deferential standard. *Van Tran*, 764 F.3d at 624. "The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 89 (2011). In order to gain relief, Leonard must satisfy both *Strickland* prongs: he must prove both that his

counsel were objectively deficient and that he was prejudiced by his counsel's deficient performance.

Because the state post-conviction court's determination that the performance of Leonard's counsel was not deficient was a reasonable application of the *Strickland* test, and the court relied on a reasonable determination of the facts, Leonard must be denied habeas relief. Counsels traditionally enjoy "discretion over deciding which witnesses to call and how to examine them." *Carter v. Mitchell*, No. 13-3996, 2016 WL 3770282, at *12 (6th Cir. July 13, 2016) (citation omitted). *Accord Rayborn v. United States*, 489 F. App'x 871, 878 (6th Cir. 2012) ("[w]hether to call a witness and how to conduct a witness' testimony are classic questions of trial strategy that merit *Strickland* deference").

Furthermore, there is no indication that trial counsel's failure to call witnesses caused Leonard to suffer any prejudice. Any minor inconsistencies Leonard now points out—including the specter of a past relationship with Gries—could not possibly have changed the impact of Leonard's confession, which included admitting to having intercourse, coupled with his bringing a loaded gun to the victim's house and her disturbing state of half-dress when shot. Introducing evidence of the purportedly "volatile" relationship between Leonard and Flick, which allegedly entailed physical violence, did not necessarily help Leonard's defense. Rather, the proposed testimony of Leonard's sister describing such lewd sexual proclivities, including the preference for the couple to use handcuffs, might instead have supported the State's theory of premeditation. None of the evidence Leonard now seeks to offer establishes Flick's consent to the sexual intercourse on the night of her murder. Accordingly, there is no indication that either of the *Strickland* prongs has been satisfied.

As to the claims that Leonard raises with respect to the penalty phase of the trial, these are equally unpersuasive. Leonard contends that trial counsel were ineffective during the penalty phase because they neither retained a mitigation specialist to investigate and present mitigation evidence nor prepared Dr. Hawkins to properly testify. Leonard submits that had trial counsel retained a mitigation specialist, they would have learned that he "was more than a little slow, needed lots of help, had learning disabilities and was the only child in the home who went to public, not private, school, and that Leonard was never taught to deal with emotions by distant

and angry parents." (Pet.'s Br. at 62). In analyzing his argument, the Ohio Court of Appeals stated as follows:

> Leonard directed his seventh claim and the balance of his fifth claim against the adequacy and effectiveness of counsel's preparation for and presentation of the case in mitigation. The defense presented at trial a mitigation theory that proposed that Leonard was a good person who had acted out of character when he killed Dawn Flick. The evidentiary material offered by Leonard in support of his claims of counsel's ineffectiveness merely supported an alternative theory of mitigation. When, as here, counsel presented the case in mitigation competently, in view of the facts available to them, evidence offered to prove the existence of mitigation evidence that counsel had failed to present at trial, and that supported an alternative theory of mitigation, did not provide proof of counsel's ineffectiveness.

*Leonard*, 813 N.E.2d at 57. Because the Ohio court correctly identified the governing standard under federal law, this Court applies the deferential standard of § 2254(d). Strategic decisions of defense counsel are "virtually unchallengeable." *Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001). Accordingly, the choice of one mitigation strategy over another does not appear unreasonable to this Court. But in any event, the record belies Leonard's argument.

The record reveals that even without calling a mitigation specialist, the jury was presented with ample evidence concerning the dysfunctional nature of the Leonard household. Throughout the penalty phase, witnesses testified as to the dynamics of the Leonard household. Leonard responds that what jurors heard about Leonard was a "paltry patchwork—a life story incoherent, inconsistent, and incomplete." (Pet.'s Br. at 58). To the contrary, the testimony presented by the family and friends at mitigation was remarkably consistent in its portrayal of the Leonard family. Leonard grew up in a family that was strict, and not long on outward displays of emotion, but hardly underprivileged; his parents sent the children to camp each summer, gave them pet rabbits, and sought to instill in them a sense of service to the community and to the Catholic Church.

Moreover, much of the information Leonard faults his counsel for not introducing would have been cumulative of the testimony of the mitigation expert, Dr. Hawkins, retained by the State, who described the Leonard household to the jury as being "rigid" and "like the Army." Dr. Hawkins testified at the penalty phase that Leonard "has an average IQ and that's pretty

consistent with the learning disability. And, in fact, he did have a learning disability and had some special educational experiences to compensate for that." (R. 61-5, Tr., PageID # 8591). He further provided insight into Leonard's family dynamic and the difficulty Leonard had in controlling his emotions. He explained that Leonard was someone who did not "do well with intimacy" and "never really learned how to manage anger so he bottle[d] it up" and would "get angry and punch a wall or throw a hammer." (*Id.* at 8596–97.) Simply because Dr. Hawkins was engaged by the court, and not counsel, is not by itself, sufficient grounds for a finding of ineffective assistance of counsel. *Martin v. Mitchell*, 280 F.3d 594, 614 (6th Cir. 2002) ("We have never found counsel to be ineffective solely because the expert used was on the State payroll."). We find nothing unreasonable in the state court's application of *Strickland* denying Leonard's post-conviction claim.

## V. Prosecutorial Misconduct

On appeal, Leonard contends that the prosecution made a number of statements that denied him a fundamentally fair trial requiring habeas relief. Specifically, he points to the following remarks made by the prosecution at the close of the guilt phase:

> The defense has asked you to find the defendant guilty of Count One and Two, of murder and gun spec., but not of either of the specifications that would take us to the second part of the trial where you would decide what the appropriate penalty is as we talked about in voir dire.

> By finding the defendant guilty of murder and a gun specification and felonious assault, we would not get to that second part were more evidence would be presented, and then you would deliberate again to decide what the appropriate penalty is.

> Remember, only by finding Patrick Leonard guilty of either Count One or Count Two, and either Specification One or Specification Two to either of those counts, will we even get to the penalty phase where his future will be decided.

> The evidence in this case is very clear. It's overwhelming. It conclusively proves that Patrick Leonard is guilty of every count in the indictment.

(R. 61-15, Trial Tr. at PageID # 8430–31.) Leonard's counsel did not object. Additionally, Leonard highlights, in the closing argument of the penalty phase, the following statement from the prosecution:

What is the next thing we heard about the attempted rape at trial?  She was handcuffed at the time.  She was held against her will.  You heard she struggled against the handcuffs.  What a scene that must have been, ladies and gentlemen, the terror in that house the last few minutes of her life.

(*Id.* at 8780–81.)  The prosecution continued:

The Judge will tell you, if you find beyond a reasonable doubt that Mr. Tieger and I proved that the aggravated circumstances outweighs [sic] the mitigation, then you shall return a verdict for the death sentence.  Shall.  That means it's your duty.

Ladies and gentlemen, we have done that.  You know what is important.  You know what to give weight to.  You follow the law.  You said you would follow it.  You said you could apply it to him.  Also be fair to the State.  We talked about that in voir dire.  By following the law you are fair to the State and you are fair to the victim. We feel like we have done our job, ladies and gentlemen, the rest is up to you.

(*Id.* at 8784–85.)  Counsel for Leonard again did not object.  At the end of both phases, the district court issued a curative instruction informing the jury that statements from the prosecution were not evidence.

The Ohio Supreme Court addressed each of these remarks in its decision on direct appeal.  As to the alleged misconduct in the guilt phase, the Ohio Supreme Court noted that trial counsel did not object to the comment and found no plain error, reasoning that:  (1) "the trial court instructed the jurors to decide the case on the evidence alone and explained that arguments of counsel were not evidence"; (2) "the weight of the evidence against Leonard, including his confession, was substantial and 'reduced the likelihood that the jury's decision was influenced by argument'"; (3) "the prosecutor's comments did not manipulate or misstate the evidence, nor did they implicate other specific rights of the accused"; and (4) "the prosecutor's comments should not be taken out of context and given their most damaging meaning."  *Leonard*, 818 N.E.2d at 267 (quoting *Darden v. Wainwright*, 477 U.S. 168, 182 (1986)).  As to the alleged misconduct during the penalty phase, the court again noted that trial counsel did not object to the statement and found no plain error because commenting on "the victim's mental anguish and asking the jury to be fair to the victim were improper but not prejudicial."  *Id*. at 268.

As an initial matter, there is some ambiguity over whether we apply AEDPA deference to Leonard's prosecutorial misconduct claim because the Ohio Supreme Court applied plain error review and in turn considered the issue procedurally waived. In the context of a discussion of procedural default, this Court has held that plain error analysis should be "viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits." *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *see also Frazier v. Jenkins*, 770 F.3d 485, 496 n.5 (6th Cir. 2014) ("We have repeatedly held that plain error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference"). However, in *Fleming v. Metrish*, a split panel of this Court held that "none of the cases . . . decide the question of whether a claim reviewed for plain error by a state court dispenses with our obligation to apply AEDPA deference to the merits of the decision reached by that court," but "instead discuss the analytically prior question of whether a federal court is permitted to hear an issue in the first place under the doctrine of procedural default." 556 F.3d 520, 530 (6th Cir. 2009). The Court concluded that AEDPA deference applied because of the statutory interests in comity, finality, and federalism. *Id.* at 532. At this point, we need not address this ambiguity because even if we assume, without deciding, that *de novo* review applies, Leonard still cannot prevail under this more lenient standard.

The Supreme Court cases of *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and *Darden v. Wainwright*, 477 U.S. 168 (1986), establish that, upon review of claims of prosecutorial misconduct in closing arguments, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). As in this case, *Donnelly* concerned a remark in the closing argument in which the prosecution alluded to the sentence that the defense might be seeking: "[t]hey (the respondent and his counsel) said they hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder." 416 U.S. at 640. Stressing the curative instruction issued by the trial court that the arguments of counsel were not evidence, the Supreme Court held that the petitioner was not deprived of a fair trial. *Id.* at 644. Similarly, in *Darden*, the Supreme Court described certain comments by the prosecution in closing argument as "improper" but held that they did not deprive the petitioner of a fair trial where they "did not

manipulate or misstate the evidence" or "implicate other specific rights of the accused such as the right to counsel or the right to remain silent." 477 U.S. at 182.

Similarly, we find that the remarks by the prosecution do not rise to the level necessitating relief. "[P]rosecutors 'must be given leeway to argue reasonable inferences from the evidence.'" *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)). Additionally, "a prosecutor has no less right to discuss a jury's duty to impose the death penalty if legally warranted than a defense counsel has the right to discuss a jury's duty to acquit (or give a life sentence) if legally warranted." *Strouth v. Colson*, 680 F.3d 596, 606 (6th Cir. 2012). Not unlike the prosecutor in *Donnelly*, the prosecution, by discussing the gun and rape specifications and their relationship to the possible penalty phase, remarked on the possible strategy of the defense—its preferred verdict would result in a sentence of less than death. Perhaps referencing of the possibility of the penalty phase was imprudent. However, the comments at issue were, like the comments made in *Darden*, "responsive" to the defense, *see* 477 U.S. at 182, and like those in *Donnelly*, "but one moment in an extended trial." 416 U.S. at 645. And in the context of the trial as a whole, the "weight of the evidence against petitioner was heavy," which "reduced the likelihood that the jury's decision was influenced by argument." *Darden*, 477 U.S. at 182. Nor was it a secret to the jury from voir dire that Leonard was facing the death penalty. Accordingly, the prosecution's argument—which was followed by a limiting instruction—that the defense was trying to evade the penalty phase did not make Leonard's conviction a denial of due process. For the same reasons, the prosecution's speculation at the penalty phase as to the victim's suffering and the comment that "by following the law you are . . . fair to the victim" (R. 61-15, Trial Tr. at PageID # 8785) were improper stray comments that nonetheless did not so infect the proceedings as to render Leonard's death sentence a violation of due process.

## VI. Ohio's Method of Conducting Proportionality Review

Leonard challenges the constitutionality of Ohio's scheme for performing proportionality review. He asserts that although the Ohio Supreme Court is obliged by statute to consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, its practice of comparing the facts of any given case only to other cases in which death was

imposed—and not to cases in which the jury or panel opted for a lesser penalty—is unconstitutional. Ohio Rev. Code § 2929.05(A).[1]

The Ohio Supreme Court rejected his arguments raised on direct appeal regarding the constitutionality of the state's death penalty scheme without any substantive discussion:

> In his 16th proposition of law, Leonard raises various constitutional challenges to Ohio death-penalty statutes. We reject these challenges. Ohio's capital-sentencing scheme is constitutional . . . . Leonard also argues that Ohio's death-penalty laws violate international treaties. We rejected the same argument under proposition of law seven. Therefore, we summarily overrule propositions of law 13 and 16.

*Leonard*, 818 N.E.2d at 269 (internal citations omitted). Citing legislative history and broad statements from death penalty jurisprudence, Leonard argues that, in the absence of any comparison to cases in which death was not imposed, this practice fails to "eliminat[e] the arbitrariness that infected death penalty schemes" such as that struck down in *Furman v. Georgia*, 408 U.S. 238 (1972).

Federal habeas courts apply the deferential standard of § 2254(d), which governs issues adjudicated on the merits, even when state courts "withhold explanations for their decisions," as in this case. *Harrington*, 562 U.S. at 99. Thus, we address whether the Ohio Supreme Court unreasonably applied clearly established federal law in denying Leonard's challenge to Ohio's proportionality review scheme. We believe that it did not.

Leonard bases his argument on Justice Stevens' statement regarding the denial of certiorari in *Walker v. Georgia*, 129 S. Ct. 453 (2008). Justice Stevens considered the "court's practice never to consider cases in which the jury sentenced the defendant to life imprisonment" to be potentially problematic under the Constitution. *Id.* at 457. He took care to distinguish the Georgia proportionality scheme upheld in *Zant v. Stephens*, 462 U.S. 862, 880 n.19 (1983), in

---

[1]The district court ruled that this claim was procedurally defaulted because Leonard "assert[ed] that he raised this claim as his nineteenth proposition of law on direct review" but "in that proposition of law Leonard alleged that his death sentence was excessive and disproportionate compared to sentences in other cases" and the district court therefore "d[id] not interpret Leonard's direct appeal claim to include an attack on the constitutionality of Ohio's proportionality review scheme in general." (R. 67, Order, PageID # 9485). This appears to be incorrect. On direct appeal, Leonard raised this challenge in his sixteenth proposition of law. (R. 61-2, Direct App. Br., PageID # 2516–17). Therefore, Leonard has "fairly presented" his claim to the state court and his claim is accordingly not procedurally defaulted. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

which the state asserted that it compared death sentences to cases resulting in lesser sentences. Justice Stevens opined that "[t]hat approach seemed judicious because, quite obviously, *a significant number of similar cases in which death was not imposed might well provide the most relevant evidence of arbitrariness in the sentence before the court.*" *Walker*, 129 S. Ct. at 454–55 (emphasis added).

This statement regarding certiorari has no precedential effect, and only serves to underscore the lack of clearly established Supreme Court law on precisely this point. *See Teague v. Lane*, 489 U.S. 288, 296 (1989) (holding that "opinions accompanying the denial of certiorari cannot have the same effect as decisions on the merits"). Leonard also fails to mention Justice Thomas' statement concurring in the denial of certiorari in *Walker* that "[t]here [was] nothing constitutionally defective about the Georgia Supreme Court's determination" where the Georgia Supreme Court "examined 21 cases in which a defendant received the death penalty for a 'deliberate plan to kill and killing for the purpose of receiving something of monetary value'" and "concluded that petitioner's death sentence was proportional to other death sentences imposed in Georgia." *Walker v. Georgia*, 129 S. Ct. 481, 482 (2008). Justice Thomas emphasized that "[p]roportionality review is not constitutionally required in any form. Georgia simply has elected, as a matter of state law, to provide an additional protection for capital defendants." *Id.* at 482–83 (citing *Pulley v. Harris*, 465 U.S. 37, 45 (1984)).

As we have previously recognized, "[t]he Supreme Court has held that the Constitution does require proportionality review, but that it only requires proportionality between the punishment and the crime, not between the punishment in this case and that exacted in other cases." *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003) (citing *Pulley*, 465 U.S. at 43–44). This Court has upheld the constitutionality of the Ohio proportionality review system on numerous occasions. *See, e.g., Williams v. Bagley*, 380 F.3d 932, 962 (6th Cir. 2004); *Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001). In fact, we explicitly stated that in "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed." *Buell*, 274 F.3d at 369. Because Leonard has not provided any contrary Supreme Court precedent, he is not entitled to relief.

**VII. Constitutionality of Post-Conviction Framework**

In his post-conviction petition in state court, Leonard argued that the Ohio post-conviction framework was unconstitutional because Ohio Rev. Code § 2953.21, which governs post-conviction procedures, failed to provide an "adequate corrective process." He raises that argument once more, claiming that Ohio's post-conviction regime unconstitutionally violates his due process and equal protection rights. The Ohio Court of Appeals denied relief on this claim.

Objecting to this holding, Leonard argued before the district court that the recent Supreme Court decisions in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), "while not recognizing post-conviction state collateral review in and of itself [as] a constitutional right[,] . . . recognize that defendants have a constitutional right to have the fair opportunity for review of the claims that can only be brought for the first time on post-conviction." (R. 53, Obj. to R&R at PageID # 1437). On appeal, he suggests that the inadequacy of the corrective process is clear because of this Court's frequent grant of habeas relief to Ohio state prisoners. Whether or not Leonard is correct that post-conviction review is "little more than a ritual," he cannot surmount the legal barriers to achieving habeas relief on this ground. (Pet.'s Br. at 86).

This Court has held that "habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief." *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (citing *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986)); *see also Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) ("the writ is not the proper means" to challenge "collateral matters" as opposed to "the underlying state conviction giving rise to the prisoner's incarceration") (internal citations omitted). Leonard acknowledges as much, but asks this Court to "revisit that conclusion." (Pet.'s Br. at 87). We decline to do so because "a published prior panel decision 'remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting *en banc* overrules the prior decision.'" *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 789 (6th Cir. 2016) (quoting *United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014)). Leonard has not pointed to any decision by an *en banc* court or any Supreme Court decision to undermine the logic of *Kirby*

that attacks on post-conviction proceedings "address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration." 794 F.2d at 247.

More to the point, in the absence of Supreme Court precedent evaluating the constitutional adequacy of state post-conviction review proceedings,[2] Leonard cannot establish the necessary precondition for issuance of the writ—namely, that the decision of the Ohio Court of Appeals, which clearly evaluated the merits of his claim, "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1).

## VIII. Sufficiency of the Evidence

In Leonard's final claim for relief, he states that the prosecution did not present sufficient evidence to obtain a conviction for rape or attempted rape. On direct appeal, the Ohio Supreme Court rejected Leonard's argument that insufficient evidence supported his rape or attempted rape conviction, correctly identifying *Jackson v. Virginia*, 443 U.S. 307 (1979), as adopted in subsequent Ohio case law, as the appropriate Supreme Court precedent to be applied. It concluded that sufficient evidence was introduced at trial to support these convictions. Recounting the evidence, the court stated:

> On the night of the murder, Leonard twice followed and stopped Flick in her car. After stopping her car the second time, Leonard ordered Flick to return to her house. Leonard followed Flick to her home, where he handcuffed her and held her at gunpoint. Leonard confessed to firing three shots into Flick's head from close range. Leonard also told police that just before he shot Flick, he had been on top of her with his pants down because they had "decided to [have sexual intercourse] on the floor."
> Although Leonard's confession suggests that Flick had consented, there was substantial evidence of forcible sexual conduct, and a rational trier of fact could find Leonard guilty of attempted rape. *See, e.g., State v. Williams* (1996), 74 Ohio St.3d 569, 576, 660 N.E.2d 724; *State v. Scudder* (1994), 71 Ohio St.3d

---

[2]In the context of a 42 U.S.C. § 1983 action, the Supreme Court explained that given the previous verdict of guilty for the criminal defendant, "[t]he State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief. '[W]hen a State chooses to offer help to those seeking relief from convictions,' due process does not dictat[e] the exact form such assistance must assume." *District Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (quoting *Pennsylvania v. Finley*, 481 U.S. 551, 559 (1987)). "Federal courts may upset a State's post-conviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Id.* Leonard has made no such showing.

263, 274–275, 643 N.E.2d 524. *But cf. State v. Davis* (1996), 76 Ohio St.3d 107, 114–115, 666 N.E.2d 1099 (holding that evidence that victim's body was found naked, that victim had been seen pushing the defendant away before she was shot, and that there were possible finger marks on one of the victim's thighs was insufficient evidence to support attempted-rape conviction). Police found Flick's body lying in a pool of blood on her living room floor, partially nude. She had been shot three times in the head, her panties had been pulled down to her thighs, one pant leg had been pulled off, the other had been pulled down to her calf, and one shoe had been removed. Her hands were bound by handcuffs, and bruising on her wrists indicated that she had struggled while handcuffed. Marks on her neck and petechiae on her face indicated that she had been strangled.

*Leonard*, 818 N.E.2d at 252.

According to Leonard, the decision of the Ohio Supreme Court was "objectively unreasonable" because the "record provided nothing more than speculation with respect to the allegation of attempted rape." (Pet.'s Br. at 92). Leonard asserts that no rational trier of fact could have found that the State met its burden of proof because "[t]he State's evidence of rape or attempted rape was purely circumstantial, and in his statement to the police Leonard explained that he and Flick had engaged in consensual sexual activity immediately prior to the homicide." (*Id.* at 91). We disagree.

To determine whether sufficient evidence was presented to support a jury's verdict, this court must consider "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Phillips v. Bradshaw*, 607 F.3d 199, 220 (6th Cir. 2010) (citing *Jackson*, 443 U.S. at 319).

Ohio law defines an "attempt" to commit a crime as follows: "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense." *State v. Heinish*, 553 N.E.2d 1026, 1034 (Ohio 1990) (quoting Ohio Rev. Code § 2923.02(A)). Ohio's "definition of rape is 'engag[ing] in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.'" *State v. Kirkland*, 15 N.E.3d 818, 839 (Ohio 2014) (quoting Ohio Rev. Code § 2907.02(A)(2)). Here, the coroner testified that there were "no injuries" to Flick's genitalia. However, the coroner also testified

that Flick was placed in handcuffs before she died and suffered injuries to her wrists that were consistent with a struggle. Additionally, Flick's neck revealed signs of strangulation, along with signs of injury throughout her body manifesting in the form of contusions on her right breast, shoulder, thighs and legs. These injuries create a reasonable inference that she was resisting whatever activity was occurring at the time. The condition of Flick's body when she was found suggested an attempt at sexual contact by Leonard. A police officer testified about how he found her body:

> Observing her, her panties were down about her knees. She had one shoe or a brown boot that was off and about maybe two feet from the body. Her pants were—it was one leg where the pants were off and the other leg where the pants was still on and the boot was still on.

(R. 61-14, Tr., PageID # 8160–61). We believe that this evidence, together with other evidence previously described in this opinion, is amply sufficient in order for a reasonable jury to convict Leonard of rape or attempted rape. Therefore, the state court's resolution of this claim was not an unreasonable application of, or contrary to, Supreme Court precedent.

### CONCLUSION

For the reasons stated above, we **AFFIRM** the order of the district court denying Leonard's petition for a writ of habeas corpus.